38 Cal.Rptr.3d 894 (2006)
136 Cal.App.4th 481
GUARDIANSHIP OF L.V., a Minor.
S.V. et al., Petitioners and Appellants,
v.
J.M., as Guardian, etc., et al., Objectors and Respondents.
No. C046252.
Court of Appeal, Third District.
February 7, 2006.
*895 Murray & Associates, Lawrence D. Murray, San Francisco, and Noah W. Kanter, Berkeley, for Petitioners and Appellants.
Law Office of Kimberly Merrifield, Kimberly Merrifield; Gilbert F. Jones Law Corporation and Gilbert F. Jones for Objectors and Respondents.
Law Office of Carroll A. Ragland and Carroll A. Ragland for Objector and Respondent L.V.
SCOTLAND, P.J.
Eighteen months after the trial court appointed guardians for L.V. (the minor), her parents petitioned to terminate the *896 guardianship. Among other things, they asserted they were now able to adequately care for the minor and, thus, they were entitled to regain custody of their child. The court denied the petition, finding that although the parents "can, at this time, provide food, shelter and clothing for the child," it would be detrimental to the minor to terminate the guardianship.
The parents appeal. Their primary contention is that because they were fit parents who could provide adequate food, clothing, and shelter for the minor, it was their constitutional right to have the guardianship terminated and the minor returned to their custody. We disagree.
As we will explain, a parent's constitutional right against judicial interference with the parent's day-to-day child rearing decisions applies to a fit parent who has custody of the child. Here, the parents did not have custody of the minor; a guardianship had been established, and the guardians had provided the minor with day-to-day custody and care for several years. Because the parents were not participating in the day-to-day parenting of the minor, they were not entitled to the constitutional protection afforded to parents acting in that role. The test for determining whether to terminate the guardianship was the best interest of the child. Substantial evidence supports the trial court's decision that to terminate the guardianship would have been detrimental to the minor and, thus, not in her best interest. The parents' other attacks on the decision also lack merit. Thus, we shall affirm the judgment.

FACTS AND PROCEDURAL BACKGROUND
For clarity and to preserve the minor's privacy, we will refer to the minor's parents as mother and father, or collectively as the parents. The minor's guardians are her maternal uncle and his wife. We will refer to them as uncle and aunt, or collectively as the guardians.
In 1999, when the minor was eleven years old, her family was experiencing difficulties. Father had an alcohol problem and multiple convictions for driving under the influence of alcohol, and his driver's license had been revoked. Mother was unemployed. Father was working but not "that much." The parents separated, father moved to another city, and mother commenced proceedings to dissolve the marriage. Mother then began to experience health problems, including a benign lung tumor and heart problems, and she was hospitalized on at least two occasions. In April 2000, mother placed the minor in the care of the uncle and aunt.
By June 2001, the parents had reconciled and were living together a long distance away from the minor. The uncle and aunt then filed a petition seeking appointment as the minor's guardians. It appears the petition was precipitated by the minor's expressed wish to remain in the custody of her uncle and aunt; by her fear that if she visited her parents, they would not allow her to return to the uncle's and aunt's care; and by an angry telephone confrontation between the minor and her parents.
After a court investigator recommended that the petition be granted, the parents agreed to a schedule of visitation; and with that stipulation, they did not oppose the petition. In August 2001, the petition was granted, making the uncle and aunt the minor's guardians. In 2002, following an annual review, the guardianship was continued in effect.
Shortly before the scheduled annual review in 2003, the parents filed a petition to terminate the guardianship. The parents and the guardians then reached an agreement *897 for the minor to spend every other week in the summer with the parents and, if everything went well, for the minor to be returned to parental custody in the fall. The trial court postponed, until after the summer, a hearing on whether to terminate the guardianship.
All did not go well. The visitation schedule failed, and the minor made it known that she was strongly opposed to being returned to her parents' custody. The guardians thus decided to oppose termination of the guardianship, and they successfully asked the court to appoint counsel for the minor to represent her interests.
At the hearing on the petition, the parents presented evidence that they had improved the conditions which had resulted in the guardianship. Father was employed and no longer was abusing alcohol and drugs; mother's health issues were under control; they had rented an apartment; and there no longer was disruption, anger, hostility or problems between them. The parents also asserted that while the minor had been in the guardians' custody, she was not getting the kind of education she needed.
It was stipulated the minor would testify that when she visited her parents, they provided her with "adequate" food, clothing, and shelter, and "guidance" in the sense "the parents directed [her] what to do and not to do," but that the conditions "could have been better."
The guardians presented the following evidence at the hearing.
Mother has a severe anger control problem; she will scream, yell, hit, and throw things, often on an unpredictable basis. Father continues to drink to excess, and he and mother often engage in loud and lengthy screaming matches. Although there was no evidence father had been physically violent to the minor, he was physically violent to her two older half brothers, both of whom eventually were removed from the home.
When the minor first came to live with the guardians, she was pale, appeared malnourished, had no muscle tone, and had "obviously poor hygiene habits." Her eyes looked sunken or glazed, and she appeared to be deprived of sleep.
The principal of the school the minor had begun to attend testified the minor was two to three years behind in most subjects. The principal noted that although the minor wore glasses, she complained of headaches caused by reading and studying. She was "extremely reserved," "[d]id not know ordinary politeness," and "did not know how to interact with a [sic] other people, especially children her own age." According to the principal, the minor lacked physical skillssuch as running, catching, and throwingthat a child of her age should have.
The minor told the guardians that she had not seen an eye doctor in years. After having an eye examination, the minor obtained new glasses and her headaches and concentration problems disappeared. In school, she was able to catch up to her grade level and make the honor role. She developed social skills and made many friends. She also developed physical skills and was an active participant in team sports.
The minor did not want the guardianship to end. Although she loved her parents and wanted to be able to talk with and visit them, she was strongly against being returned to their custody.
In arguing for continuation of the guardianship, the minor's counsel stated: "This child has been in a stable environment for four years. To remove her from it and return her as though she was a borrowed *898 car to her parents would do great damage to this child and to whatever hope the parents have of any kind of relationship with her."
The parents took the position that (1) they were currently fit parents because they could provide adequate food, shelter, clothing, and guidance for the minor, and (2) since they now were fit parents, it was their constitutional right to have the guardianship terminated and the minor returned to their custody.
The trial court found that the parents "can, at this time, provide food, shelter and clothing for the child." Nevertheless, the court concluded that "when a natural parent is seeking to terminate the guardianship there must be a showing of `overall fitness' on the part of the natural parent seeking to end the guardianship sufficient to overcome the inherent trauma of removing a successful caregiver." Based upon its review of the facts, the court found that "[t]o terminate this guardianship at this time based on the facts presented would be detrimental in every sense of the word to [the minor]." Thus, the court denied the parents' petition.

DISCUSSION

I
The parents assert that this case presents a mixed question of fact and law, and that we should review the issues de novo; in the words of their counsel, we "should give no deference to the ruling or judgment of the trial court, and conduct essentially the same inquiry as that conducted by the trial court. . . ." We disagree.
The resolution of a legal dispute involves three steps: (1) establishing the facts; (2) determining the applicable law; and (3) applying the law to the facts. (Ghirardo v. Antonioli (1994) 8 Cal.4th 791, 800-801, 35 Cal.Rptr.2d 418, 883 P.2d 960.)
The first step, determining the relevant facts, is committed to the trier of the facts and is reviewed on appeal with deference to the factfinder's decision by applying the venerable substantial evidence test. (Ghirardo v. Antonioli, supra, 8 Cal.4th at pp. 800-801, 35 Cal.Rptr.2d 418, 883 P.2d 960; see Guardianship of Kassandra H. (1998) 64 Cal.App.4th 1228, 1236, 75 Cal.Rptr.2d 668.) We view the evidence in a light most favorable to the trial court's decision, resolving all conflicts in the evidence and drawing all reasonable inferences in support of that court's findings. (Crawford v. Southern Pacific Co. (1935) 3 Cal.2d 427, 429, 45 P.2d 183.) In short, we review the evidence but do not weigh it; we defer to the trial court's findings to the extent they are supported by substantial evidence. (Estate of Teel (1944) 25 Cal.2d 520, 527, 154 P.2d 384; County of Mariposa v. Yosemite West Associates (1988) 202 Cal.App.3d 791, 807, 248 Cal.Rptr. 778.)
Throughout their brief, the parents state and argue the facts in a manner most favorable to themselves, in disregard of contrary evidence. This is inappropriate. The assertion that this case presents a mixed question of fact and law has relevance only to the third step in the dispute resolution process, application of the law to the facts. (Ghirardo v. Antonioli, supra, 8 Cal.4th at pp. 800-801, 35 Cal.Rptr.2d 418, 883 P.2d 960.) Appellate review of the trial court's determination of the first step in the process, finding the underlying facts, is confined to substantial evidence review. (Ibid.)
With respect to the second step in the dispute resolution process, determining the applicable law, we independently review all issues of law presented by the parents. (Ghirardo v. Antonioli, supra, 8 Cal.4th at p. 800, 35 Cal.Rptr.2d 418, 883 P.2d 960; *899 Hill v. City of Long Beach (1995) 33 Cal.App.4th 1684, 1687, 40 Cal.Rptr.2d 125.)
The third step, applying the law to the facts, is reviewed under the deferential "`"`clearly erroneous standard'"'" if the inquiry is essentially factual, i.e., if it "`"`is founded "on the application of the [trial court's] experience with the mainsprings of human conduct". . . .'"'" (Ghirardo v. Antonioli, supra, 8 Cal.4th at pp. 800-801, 35 Cal.Rptr.2d 418, 883 P.2d 960.) If, however, the inquiry requires a consideration, in a factual context, of legal principles and their underlying values, the question is predominately legal and will be reviewed de novo. (Ibid.; see also Crocker National Bank v. City and County of San Francisco (1989) 49 Cal.3d 881, 888, 264 Cal.Rptr. 139, 782 P.2d 278.)
The decision whether to terminate a guardianship is committed to the sound discretion of the trial court. (Prob.Code, § 1601; Guardianship of Stephen G. (1995) 40 Cal.App.4th 1418, 1426, 47 Cal.Rptr.2d 409.) It is an inquiry that is particularly founded on application of the trial court's experience with human conduct. Thus, when the trial court applies the appropriate legal standard, its determination is subject to deferential review on appeal. (Guardianship of M.S.W. (1982) 136 Cal.App.3d 708, 711-712, 186 Cal.Rptr. 430; Guardianship of Davis (1967) 253 Cal.App.2d 754, 761, 61 Cal.Rptr. 297; Guardianship of White (1948) 84 Cal.App.2d 624, 628, 191 P.2d 466.) Hence, we reject the argument that we can disregard the trial court's determination and decide the issue anew.

II
The parents claim that because they are fit parentsi.e., they can provide adequate food, clothing, shelter, and guidance for the minorthey are entitled to have the guardianship terminated and the minor returned to their custody. This is not the statutory standard in California law. As we will explain, it is the best interest of the child that governs whether the trial court should terminate a guardianship.
Former section 1601 of the Probate Code stated in pertinent part: "Upon petition of the guardian, a parent, or the ward, the court may make an order terminating the guardianship if the court determines that it is no longer necessary that the ward have a guardian or that it is in the ward's best interest to terminate the guardianship." (Stats.1990, ch. 79, § 14, p. 522; further section references are to the Probate Code unless otherwise specified.)
In Guardianship of Kassandra H., supra, 64 Cal.App.4th 1228, 75 Cal.Rptr.2d 668 (hereafter Kassandra H.), the Court of Appeal observed that "[t]he troublesome part of [former section 1601] lies in the disjunctive `or.' By using that little word, the Legislature signaled that a guardianship might be terminated even if it wasn't in the best interest of the child to do so, as long as it was `no longer necessary' for the child to have a guardian." (Kassandra H., supra, 64 Cal.App.4th at pp. 1230-1231, 75 Cal.Rptr.2d 668, orig. italics.)
Kassandra H. concluded that the phrase "no longer necessary" cannot be construed as a mere synonym for "best interest" of the child because that would make the phrase surplusage. (Kassandra H., supra, 64 Cal.App.4th at pp. 1238-1239, 75 Cal.Rptr.2d 668.) Nevertheless, the court rejected the view that a guardianship must be terminated merely because a parent meets the minimal standard of fitness. (Id. at pp. 1236-1237, 75 Cal.Rptr.2d 668.) "[C]ontinuity and stability in a child's life most certainly count for something. . . . Children are not dogwood trees, to be uprooted, replanted, then replanted again *900 for expediency's sake." (Id. at p. 1238, 75 Cal.Rptr.2d 668.) "In substantive family law, stability and continuity in a child's living arrangement are so important in themselves that there must be a `persuasive showing of changed circumstances affecting the child' to overcome the disruption necessarily inherent in any change of custody." (Id. at p. 1239, 75 Cal.Rptr.2d 668, orig. italics.)
Thus, Kassandra H. held that in considering a parent's request to terminate a guardianship, the trial court must evaluate the parent's fitness in the context of whether changed circumstances justify a change in custody. (Kassandra H., supra, 64 Cal.App.4th at pp. 1233, 1236, 75 Cal.Rptr.2d 668.) "The bottom line is this: The `no longer necessary' language of Probate Code section 1601 necessarily requires a showing of overall fitness on the part of the natural parent seeking to end the guardianship sufficient to overcome the inherent trauma of removing a successful caregiver." (Id. at pp. 1239-1240, 75 Cal.Rptr.2d 668.)
In Guardianship of Simpson (1998) 67 Cal.App.4th 914, 79 Cal.Rptr.2d 389 (hereafter Simpson), the Court of Appeal that decided Kassandra H. reiterated and adhered to its earlier decision. In Simpson, a father sought to terminate a guardianship of his children, and the trial court put the burden on the guardians to prove by clear and convincing evidence that returning the children to father's custody would be detrimental to them. Simpson concluded this was erroneous. "Instead, as California courts have done for generations, the court should have examined the totality of evidence bearing on the father's fitness with the burden upon him to show sufficient overall fitness to justify the termination of the guardianship." (Simpson, supra, 67 Cal.App.4th at p. 921, 79 Cal.Rptr.2d 389.)
Since Kassandra H. and Simpson were decided, the Legislature has acted to eliminate the aspect of the law those decisions found to be troublesome. In 2002, the Legislature amended section 1601 to state in pertinent part: "Upon petition of the guardian, a parent, or the ward, the court may make an order terminating the guardianship if the court determines that it is in the ward's best interest to terminate the guardianship." (Stats.2002, ch. 1118, § 6.) Thus, the Legislature eliminated the "no longer necessary" ground for termination of a guardianship, and established the best interest of the ward as the sole criterion.
Any doubt as to the Legislature's intent is resolved by reference to other aspects of the 2002 legislation, including (1) the enactment of section 1610, subdivision (a) to state, "The Legislature finds and declares that it [is] in the best interest of children to be raised in a permanent, safe, stable, and loving environment," and (2) the amendment of Family Code section 3041.
Prior to the 2002 legislation, Family Code section 3041 provided that before placing a child in the custody of a person or persons other than a parent without the consent of the parents, a trial court had to find that granting custody to a parent would be detrimental to the child and that granting custody to the nonparent was required to serve the best interests of the child. (Stats.1993, ch. 219, § 116.50, p. 1624.) That standard is applicable in proceedings to establish a guardianship and to appoint a guardian. (§ 1514, subd. (b); Guardianship of Stephen G., supra, 40 Cal.App.4th at p. 1423, 47 Cal.Rptr.2d 409.)
In the 2002 legislation, the substance of former Family Code section 3041 was retained as subdivision (a) of that section, and three new subdivisions were added as follows:
*901 "(b) Subject to subdivision (d), a finding that parental custody would be detrimental to the child shall be supported by clear and convincing evidence.
"(c) As used in this section, `detrimental to the child' includes the harm of removal from a stable placement of a child with a person who has assumed, on a day-to-day basis, the role of his or her parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment does not require any finding of unfitness of the parents.
"(d) Notwithstanding subdivision (b), if the court finds by a preponderance of the evidence that the person to whom custody may be given is a person described in subdivision (c), this finding shall constitute a finding that the custody is in the best interest of the child and that parental custody would be detrimental to the child absent a showing by a preponderance of the evidence to the contrary." (Stats.2002, ch. 1118, § 3.)
The amendment of Family Code section 3041 demonstrates the Legislature's intent when at the same time it amended section 1601. In short, the Legislature agreed with the holding in Kassandra H. that "continuity and stability in a child's life most certainly count for something" (Kassandra H., supra, 64 Cal.App.4th at p. 1238, 75 Cal.Rptr.2d 668) and found that, in the absence of proof to the contrary, removing a child from what has been a stable, continuous, and successful placement is detrimental to the child. (Fam.Code, § 3041, subds.(c), (d).) And in that circumstance, a finding of parental unfitness is not necessary to a finding of detriment to the child. (Fam.Code, § 3041, subd. (c).)
Consequently, now the best interest of the child is the sole criterion for termination of a guardianship. (§ 1601.)[1] The fact that the trial court in this case applied the standard set forth in Kassandra H. and Simpson did not harm the parents because that standard was more favorable to them than is the legal standard set forth in section 1601.

III
In the parents' view, the best interest of the child standard for termination of a guardianship is unconstitutional as applied to them. Relying on the United States Supreme Court's decision in Troxel v. Granville (2000) 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (hereafter Troxel), they contend that because they are able to provide minimally adequate food, clothing, shelter, and guidance for the minor, their fundamental rights as biological parents required the trial court to terminate the guardianship and return the minor to their custody. We disagree.
Troxel involved a court-ordered visitation schedule in favor of grandparents and against a natural, custodial parent. Noting that all 50 states have enacted statutes providing for grandparent visitation in some form (Troxel, supra, 530 U.S. at p. 73, fn. *, 120 S.Ct. at p. 2064, fn. *, 147 L.Ed.2d at pp. 61-62, fn. * (plur. opn. of O'Connor, J.)), the Supreme Court found the State of Washington nonparental visitation statute at issue in Troxel was "breathtakingly broad." (Id. at p. 67, 120 S.Ct. at p. 2061, 147 L.Ed.2d at p. 57.) The statute permitted any person at any time to petition for visitation and gave trial *902 courts the power to overturn any decision by a fit custodial parent based solely upon the judge's view of the best interest of the child. (Id. at p. 67, 120 S.Ct. at pp. 2061, 147 L.Ed.2d at pp. 57-58.)
The four-justice plurality opinion concluded that, as applied to that case, the Washington statute unconstitutionally infringed upon the "fundamental right of parents to make decisions concerning the care, custody, and control of their children." (Troxel, supra, 530 U.S. at pp. 66, 67, 120 S.Ct. at pp. 2060, 2061, 147 L.Ed.2d at pp. 57-58.) This was so because there was no allegation or proof that the mother, who had maintained continuous custody of the children, was an unfit parent (id. at pp. 60-61, 68, 120 S.Ct. at pp. 2060-2061, 2061, 147 L.Ed.2d at pp. 53, 58); the mother had agreed to meaningful grandparental visitation, but simply did not allow it with the frequency and duration desired by the grandparents (id. at pp. 60-61, 120 S.Ct. at p. 2057-2058, 147 L.Ed.2d at p. 53); and the case involved nothing more than a simple disagreement over the mother's decision (id. at p. 72, 120 S.Ct. at p. 2063, 147 L.Ed.2d at pp. 60-61).
The plurality opinion held that parenting decisions made by fit, custodial parents must be presumed to be in the best interest of their child. (Troxel, supra, 530 U.S. at p. 68, 120 S.Ct. at p. 2061, 147 L.Ed.2d at p. 58.) The problem in Troxel was "not that the [trial court] intervened, but that when it did so, it gave no special weight at all to [the parent's] determination of her daughters' best interests." (Id. at p. 69, 120 S.Ct. at p. 2062, 147 L.Ed.2d at p. 58.) In fact, the trial court appeared to have applied a presumption in favor of the grandparents and against the mother's decision. (Ibid.) Because a court may not interfere with the child rearing decisions of a fit, custodial parent simply because it believes that a better decision could be made, the Washington statute was unconstitutional as applied in that case. (Id. at pp. 72-73, 120 S.Ct. at pp. 2063-2064, 147 L.Ed.2d at p. 61.)
Appellate courts in California have followed the plurality opinion in Troxel in concluding that nonparent visitation orders were unconstitutional as applied to the specific facts at issue. (See In re Marriage of W. (2003) 114 Cal.App.4th 68, 74-75, 7 Cal.Rptr.3d 461; Zasueta v. Zasueta (2002) 102 Cal.App.4th 1242, 1244, 126 Cal.Rptr.2d 245; Herbst v. Swan (2002) 102 Cal.App.4th 813, 814, 125 Cal.Rptr.2d 836; Punsly v. Ho (2001) 87 Cal.App.4th 1099, 1101, 105 Cal.Rptr.2d 139; Kyle O. v. Donald R. (2000) 85 Cal.App.4th 848, 851, 102 Cal.Rptr.2d 476.) However, it also has been recognized that in appropriate circumstances a court may impose a visitation order against a custodial parent, and that such orders are not per se invalid. (In re Marriage of Harris (2004) 34 Cal.4th 210, 226-227, 17 Cal.Rptr.3d 842, 96 P.3d 141; In re Marriage of Ross & Kelley (2003) 114 Cal.App.4th 130, 140, 7 Cal.Rptr.3d 287; Fenn v. Sherriff (2003) 109 Cal.App.4th 1466, 1478-1479, 1 Cal.Rptr.3d 185.) A custodial parent's decisions regarding visitation are entitled to presumptive validity and must be accorded "special weight," but they are not immune from judicial review. (Fenn v. Sherriff, supra, 109 Cal.App.4th at p. 1479, 1 Cal.Rptr.3d 185.)
The decisions in Troxel and its California progeny have no application to this case because they dealt with judicial interference in the day-to-day child rearing decisions of a fit, custodial parent. Here, the parents no longer had custody of the minor. A guardianship had been established and the guardians had provided the minor with day-to-day custody and care for several years.
*903 Also inapplicable are the decisions, cited by the parents, that addressed orders freeing a child from parental custody and control. (In re Cheryl E. (1984) 161 Cal.App.3d 587, 606, 207 Cal.Rptr. 728; In re T.M.R. (1974) 41 Cal.App.3d 694, 703, 116 Cal.Rptr. 292.) Here, the trial court did not terminate all parental rights and responsibilities with respect to the minor. Those rights and responsibilities remained suspended by the decision not to end the guardianship (In re Cheryl E., supra, 161 Cal.App.3d at p. 606, 207 Cal.Rptr. 728; In re T.M.R., supra, 41 Cal.App.3d at p. 703, 116 Cal.Rptr. 292), but the court had continuing jurisdiction to reinstate them in the future.
Nor are the parents helped by other decisions upon which they relydecisions addressing initial orders that established guardianships or otherwise removed children from parental custody. (In re B.G. (1974) 11 Cal.3d 679, 698-699, 114 Cal.Rptr. 444, 523 P.2d 244; Guardianship of Jenna G. (1998) 63 Cal.App.4th 387, 394, 74 Cal.Rptr.2d 47; Guardianship of Stephen G., supra, 40 Cal.App.4th at p. 1432, 47 Cal.Rptr.2d 409.) As recognized by the Court of Appeal in Guardianship of Stephen G., supra, 40 Cal.App.4th at page 1426, 47 Cal.Rptr.2d 409, a decision to terminate a guardianship rests in the broad discretion of the trial court and is not determined on the same basis as the creation of the guardianship or other living arrangement.
The parents have not cited, and we have not discovered, any Supreme Court decision, state or federal, that holds expressly or by necessary implication that natural parents have an automatic right to termination of a guardianship absent an express finding of their unfitness to care for the child, or that otherwise precludes the application of a "best interest of the child" standard to the termination of a guardianship.
For the following reasons, we decline to create such a constitutional standard that would overturn the Legislature's considered decision to provide that a guardianship may be terminated if a court determines that it is in the child's best interest to do so. (§ 1601.)
"`Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.' [Citation.]" (Lehr v. Robertson (1983) 463 U.S. 248, 260, 103 S.Ct. 2985, 2992, 77 L.Ed.2d 614, 626 (hereafter Lehr), italics omitted.) "[T]he rights of the parents are a counterpart of the responsibilities they have assumed." (Id. at p. 257, 103 S.Ct. at p. 2991, 77 L.Ed.2d at p. 624.)
In other words, parental rights derive from a biological connection with the child and from acting in the role of parent. (Lehr, supra, 463 U.S. at p. 261, 103 S.Ct. at p. 2993, 77 L.Ed.2d at p. 626.) Thus, "the mere existence of a biological link does not merit equivalent constitutional protection [to that which exists when a parent has come forward to participate in the rearing of the child].... `[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children ... as well as from the fact of blood relationship.' [Citation.]" (Ibid.)
For example, the Supreme Court in Quilloin v. Walcott (1978) 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (hereafter Quilloin) rejected the constitutional claim of a natural father who opposed the adoption of his child by the child's stepfather. According to the natural father, in the absence of a finding of his unfitness as a parent, he *904 had a constitutional right to veto the adoption of his child. (Id. at p. 252, 98 S.Ct. at p. 553, 54 L.Ed.2d at pp. 517-518.) The court disagreed: "We have little doubt that the Due Process Clause would be offended `[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' [Citation.] But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except [the natural father]. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, was in the `best interests of the child.'" (Quilloin, supra, 434 U.S. at p. 255, 98 S.Ct. at p. 555, 54 L.Ed.2d at p. 520; see also Lehr, supra, 463 U.S. at pp. 262, 266-267, 103 S.Ct. at pp. 2993, 2996, 77 L.Ed.2d at pp. 627, 630.)
Another factor that must be considered is the law's recognition of the importance of continuity and stability in a child's living arrangements. (§§ 1601, 1610; Fam.Code, § 3041, subds. (c), (d).) Thus, "the paramount need for continuity and stability in custody arrangementsand the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretakerweigh heavily in favor of maintaining ongoing custody arrangements." (In re Marriage of Burgess (1996) 13 Cal.4th 25, 32-33, 51 Cal.Rptr.2d 444, 913 P.2d 473; see also In re Marriage of LaMusga (2004) 32 Cal.4th 1072, 1093, 12 Cal.Rptr.3d 356, 88 P.3d 81; Burchard v. Garay (1986) 42 Cal.3d 531, 541, 229 Cal.Rptr. 800, 724 P.2d 486; In re Marriage of Carney (1979) 24 Cal.3d 725, 730-731, 157 Cal.Rptr. 383, 598 P.2d 36.) This is true regardless of whether the ongoing custody arrangement was established by court order or by the consent of a noncustodial parent. (Burchard v. Garay, supra, 42 Cal.3d at pp. 536-537, 229 Cal.Rptr. 800, 724 P.2d 486.)
Here, although the parents had a biological link to the minor, they relinquished their day-to-day parental relationship with her when mother voluntarily placed the minor with the uncle and aunt because the parents were unable to provide adequate care for her. Then, the parents did not oppose having the uncle and aunt named to be the minor's guardians. Because the parents were no longer participating in the day-to-day parenting of the minor, they were not entitled to the constitutional protection afforded to parents who are acting in that role. (Cf. Lehr, supra, 463 U.S. at p. 261, 103 S.Ct. at p. 2993, 77 L.Ed.2d at p. 626.)
This is not a case where the court's order had the effect of breaking up a natural family over the family's objections. Rather, the refusal to terminate the guardianship continued the family unit already in existence, a result desired by all concerned, except the natural parents. As did the United States Supreme Court in the situation presented in Quilloin, supra, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511, we conclude that constitutional protections did not require the trial court to find anything more than that it was in the best interest of the minor not to terminate the guardianship. (See id. at p. 255, 98 S.Ct. at p. 554, 54 L.Ed.2d at p. 520.)

*905 IV
The parents raise a variety of other challenges to the trial court's decision.

A
In passing, they state that they "responsibly and voluntarily sent [the minor] to live with her aunt and uncle" until they could resolve their health and financial problems, and thereafter they were found to be fit parents. Thus, they claim, the "State of California has never determined that [they] were unfit, neglectful or abusive." This claim ignores that the petition to establish the guardianship alleged it was necessary because "[p]arental custody of the minor would be detrimental" to her. This was so, the petition alleged, because the parents had "problems in the past with respect to physical violence and excessive use of alcohol" and they were not "currently capable or willing to provide her with proper care." The parents did not oppose the petition, and the trial court found it was "necessary" to appoint guardians for the minor. In light of the uncontested allegations of the petition, the court's ruling establishing the guardianship constituted a finding that the parents were unfit to have custody of the minor at that time.
Likewise, viewed in the light most favorable to the judgment, the record does not support the parents' claim that the parties understood the minor would be returned to the parents as soon as they resolved their health and financial problems. Indeed, the court investigator's report states the uncle and aunt anticipated that the minor would remain in their custody until she reached the age of 18.

B
According to the parents, the trial court erred in basing its finding of detriment on past events, rather than current conditions. We disagree. It is true that current circumstances and expectations for the future are most relevant to the decision whether it is necessary to establish a guardianship. However, "a parent's future potential is undoubtedly revealed in the parent's past behavior with the child." (In re Laura F. (1983) 33 Cal.3d 826, 833, 191 Cal.Rptr. 464, 662 P.2d 922.) Thus, prior conduct is relevant in determining the best interests of the child. (See In re Marriage of McLoren (1988) 202 Cal.App.3d 108, 115, 247 Cal.Rptr. 897.) In any event, the guardians introduced evidence, apparently believed by the trial court, that the substance abuse and emotional problems which had made the parents unfit to have custody of the minor were continuing problems at the time of the hearing.

C
There is absolutely no merit to the parents' contention that the trial court assessment of harm to the minor was based simply on, in the parents' words, "who it felt were better parents" and whether the minor "would be less well off because she would have to move from her current environment." And nothing in the record even remotely supports the parents' claim that the court was "punish[ing them] for not being perfect in the past and because it view[ed] the Guardians as `better parents.'"
We turn now to the parents' allegations against the guardians.

D
In the trial court, mother asserted that the minor's adamant insistence that she wants the guardianship to continue was a matter of acting out because of the uncle's "almost cult like" "control and domination" over her. On appeal, the parents say the guardians have been "ruthless mudslingers" *906 and argue the trial court "did not analyze the contemptuous, controlling and evasive conduct of the [g]uardians during the guardianship in relation to the [g]uardian's fitness as it should have...."
However, the parents' claim that the guardians have hindered their contacts with the minor and sabotaged their relationship consists of mere accusations without specific evidentiary support. The evidence credited by the trial court shows otherwise.
The uncle testified the guardians had encouraged the minor to visit her parents and speak with them on the telephone. But, eventually, her telephone calls and visits with the them caused her to feel harassed and upset. Exacerbating the problem, the parents felt they should be able to call whenever they wanted and expected the minor to listen for as long as they desired. As the minor became more involved in schoolwork, team sports, and social activities, she wanted to have more control over the telephone calls. Although the minor wanted to be able to talk with and visit her parents, she began putting restrictions on the days and times when the parents could call. The uncle also testified the minor's personal visits with her parents were often unpleasant, and the minor wanted more flexibility with respect to visitation. The minor told the court investigator that she wanted some discretion with respect to visits and that she thought more frequent but shorter visits might be appropriate.
It appears that after the parents filed the petition to terminate the guardianship and refused to relent in their efforts, their relationship with the minor deteriorated to the point that she refused to talk to them until ordered to do so by the court. Letters the minor wrote to the parents during this time reflect that the breakdown in their relationship was the result of the parents' conduct rather than the guardians' influence. Among other things, the minor was adamant about not wanting to leave what she considers her home and where her church, school, friends, and pets are. She was angry that the parents continued to insist that she has dyslexia and needs special classes. She was angry that the parents continually said bad things about the guardians, her school, and the like. She was unhappy with the parents pressuring her to return to their custody. Saying she did not like "being manipulated, guilt tripped, or yelled at," the minor told her parents: "I am fifteen, and have my own thoughts, ideas, and opinions." She added: "I realy [sic] want to get along with you, and visit you, but the way things have been doesn't work. You need to respect me, and treat me as a person not a pet."
In light of the whole record, it is readily apparent that the parents, not the guardians, have caused the problems in the parents' relationship with the minor.

E
Much of the parents' attack on the guardians is directed to the minor's schooling while in the guardians' care.
They say the minor suffers from dyslexia and, despite the parents' efforts, the guardians have ignored her dyslexia. This is another example of the parent's baseless allegations against the guardians. The evidence shows that when the minor was enrolled in school, a review of her cumulative file indicated a need for vision testing but made no suggestion of learning disabilities. Once she obtained a new prescription for glasses, her performance improved dramatically. After the petition to terminate the guardianship was filed and this issue arose, the minor was tested by an ophthalmologist and by the school district. *907 The testing showed the minor is not dyslexic and in fact is an above average student.
The parents also are critical of the school in which the guardians enrolled the minor. They claim the school will not prepare her for higher education and that the guardians have ignored their objections to the school. The evidence paints another picture.
While in the parent's custody, the minor attended public school through the fourth grade. Mother home schooled the minor for the fifth and sixth grades. When the minor began living with the guardians near the end of her sixth grade year, the guardians took over home schooling. The uncle was shocked at the minor's poor level of proficiency. The guardians worked with her intensely through the remainder of the school year and enrolled her in summer sessions. The uncle then learned of a public school program that would suit the minor's needs, but there were no openings in the program. Thus, the uncle sought to enroll the minor in a private school, but it would take her only for the fifth grade on a probationary basis. Instead, the uncle enrolled the minor in another private school where she would be able to work at her tested levels without the stigma of being put in a grade that was one year below her age level.
The uncle testified he discussed the matter with the parents and, at the time, they were in favor of the school. The principal of the school testified it is college preparatory and 98 percent of its graduates go on to attend college. During the three years the minor spent at the school, she made dramatic improvement and was able to catch up to grade level. By the time of the hearing on motion to terminate the guardianship, the minor was enrolled in high school and had achieved a 3.3 grade point average during her first quarter of work.
This evidence shows the guardians did not neglect the minor's educational needs.

F
The parents also attack the trial court, claiming they got "home-towned" by a biased judge who gave "inappropriate legal deference to local parties, witnesses, lawyers and experts." According to the parents, bias is demonstrated in what they characterize as the judge's "insulting comments" against them in the statement of decision where the judge said: "It appears that the parents are placing their desires above the best interest of their child. Any new circumstances which might point to justification to terminate a guardianship must be sufficient enough to overcome the inherent disruption of tearing a child away from a guardian who has been and is doing a good job of caring for and nurturing the child. To terminate this guardianship at this time based on the facts presented would be detrimental in every sense of the word to Lisa. It is unfortunate the parents fail to recognize this fact."[2]
This claim of judicial bias is utterly reckless. It was the trial judge's duty to consider and pass upon the evidence presented to him. An opinion formed by a judge as the result of a judicial hearing, even though it is adverse to a party, does not amount to bias. (People v. Yeager (1961) 55 Cal.2d 374, 391, 10 Cal.Rptr. 829, 359 P.2d 261, overruled on another ground in People v. Chi Ko Wong (1976) 18 Cal.3d 698, 716, fn. 14, 135 Cal.Rptr. 392, 557 P.2d 976; Kreling v. Superior Court (1944) 25 *908 Cal.2d 305, 311-312, 153 P.2d 734.) The judge's observation was an appropriate comment on the evidence that he found to be credible.
The parents also claim the judge was biased because throughout the trial, he "entertained testimony from incompetent witnesses...." However, the parents make no effort to identify the allegedly incompetent witnesses or to demonstrate why they were incompetent. In fact, the witnesses who testified in support of continuing the guardianship included two of mother's sisters, one of mother's adult sons, and the son's girlfriend who had lived in mother's home shortly before the guardianship was established. These witnesses, as well as the guardians and the principal of the school the minor had attended for three years, had personal first-hand knowledge of matters about which they testified and thus were competent witnesses. (Evid.Code, § 702.)

V
In conclusion, the trial court correctly determined that the guardianship should not be terminated simply because the parents were in a position to provide food, clothing, and shelter; rather, the totality of the circumstances must be considered. Substantial evidence establishes that at the time of the hearing, mother still had a severe anger control problem reflected in screaming, yelling, hitting, and throwing things. Father still had a drinking problem and engaged in lengthy, often hours long, screaming matches with mother. It appeared the parents did not even recognize, let alone attempt to deal with, these problems. In addition, when the minor first went to live with the guardians, she was in rather poor physical, emotional, and educational condition. By the time of the hearing, the minor had lived with the guardians for nearly four years. During that time, she had thrived in all areas of her life. The minor was of the age and reasoning capacity to be entitled to have her views considered (see Fam.Code, § 3042, subd. (a)), and she adamantly opposed termination of the guardianship. Under the circumstances, the trial court did not err in concluding that it was in the minor's best interest not to terminate the guardianship because doing so would be detrimental to the minor.

DISPOSITION
The judgment is affirmed.
We concur: BLEASE and CANTIL-SAKAUYE, JJ.
NOTES
[1] Because a guardianship automatically terminates upon the emancipation of the child (Prob.Code, § 1600, subd. (b)), a proceeding for judicial termination of the guardianship in such a circumstance is unnecessary.
[2] The parent's counsel inexcusably misquotes the judge as saying it is "a shame" the parents fail to recognize that termination of the guardianship would be detrimental to the minor.