Filed 4/23/13  Guardianship of J.G. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Guardianship of J.G., a minor. | |
| B.W.,<br><br>          Petitioner and Respondent,<br><br>v.<br><br>L.F.,<br><br>          Objector and Appellant. | A134472<br><br>(Contra Costa County<br>Super. Ct. No. P04-01537) |

When the natural mother (Mother) of J.G. (the minor) found herself incapable of caring for him, she consented to a probate guardianship, turning over responsibility for the minor's care to her own mother (Guardian).  During the first years of the guardianship, Mother maintained contact with the minor, but her continued drug use rendered her incapable of resuming his care.  As Mother eventually overcame her problems, seeking unsupervised visitation and playing a greater role in his life, she and Guardian proved incapable of cooperating in the minor's care.  The probate court eventually terminated the guardianship, concluding the continuing conflict between Mother and Guardian was harmful to the minor.  Guardian contends the probate court abused its discretion for a variety of reasons, but we find no error and affirm.

## I.  BACKGROUND

The minor was born in February 2004 into a deeply dysfunctional home.  Mother had been a methamphetamine addict from age 18, and his father had a long criminal record, including charges of kidnapping, armed assault, and domestic violence.  When the

minor was seven months old, Mother abandoned him with Guardian, her own mother. Mother did not oppose a petition for appointment of Guardian as a temporary guardian, filed in November 2004. At the time, as Mother later recognized, she "was in no condition to take care of myself or a child." The guardianship was made permanent in February 2005, just after the minor's first birthday. Mother's involvement in the minor's life over the following two years was sporadic, as she continued to struggle with drug abuse. Despite her problems, however, she visited with the minor fairly frequently and remained a presence in his life.

Conflict between Mother and Guardian began almost with the inception of the guardianship. In late 2005, Mother was forced to apply for relief to the probate court when Guardian, as she admitted, refused to comply with the court's visitation order. In requiring compliance, the court noted, "It is not reasonable for [Guardian] to decide unilaterally whether she will choose to comply with court orders. Ideally the parties' relationship will improve to the point where no specific visitation orders are required. Clearly they are not yet at that point." Thereafter, Mother and Guardian continued to bring various disputes to court. Notwithstanding the hopes of the court, the parties' relationship seemed only to worsen over the subsequent six years.

In August 2007, three and a half years after the minor's birth, Mother asked the court for unsupervised visitation "to begin the slow transition for my son to eventually resume in my full custody." A child custody evaluator appointed by the court filed a report in January 2008. According to the report, the parties were still in conflict over Mother's visitation. Guardian, who criticized Mother as insensitive, untrustworthy, and tolerant of risky conduct, reported to the minor's therapist that the minor showed "stress and agitation" in connection with the visits. The therapist had observed similar signs. The minor's attorney believed Guardian had thwarted Mother's supervised visitation with the minor by being "inflexible" with respect to visitation supervisors. The evaluator concluded Mother was "more stable than years ago" because she had ceased drug use eight months earlier and begun living with her father, but the evaluator believed Mother's

2

"underlying personality problems" would interfere with her parenting and recommended continued custody to Guardian.

Notwithstanding the evaluator's report, Mother filed a petition to terminate the guardianship in March 2008. In the months afterward, the parties continued disputing the scope and nature of Mother's visitation. In a declaration requesting an "interim visitation order," Guardian stated the minor "in parallel with the increased visitation and supervision changes" had "exhibited a re-occurrence and increase of anxiety symptoms." Based on the minor's comments, the therapist blamed these symptoms on the conduct of Mother and her family members, although the therapist had never actually observed the interaction between the minor and Mother. Mother blamed the minor's symptoms on Guardian's manipulative conduct. As a result of the parties' inability to cooperate, even seemingly trivial matters continued to require court intervention.

In November 2008, Mother proposed her paternal grandparents as replacement guardians. In an interview with the investigator appointed in connection with this proposal, Guardian expressed concern over the minor's anxiety in anticipation of visits with Mother and criticized Mother's conduct with the minor. The minor himself told the investigator he liked visiting Mother. Mother was equally critical of Guardian, believing she was thwarting her own attempts to reestablish a relationship with the minor. When the investigator covertly observed Mother's interactions with the minor at a park, the minor appeared "carefree," and the minor, Mother, and her grandparents "appeared to have a genuine, loving and connected relationship with one another." In a brief report to the court, the minor's counsel similarly noted warm and positive relationships between both the minor and Mother and the minor and Guardian, and the minor told the attorney he "had fun" at both homes.

A three-day trial on the petition to terminate the guardianship or replace the guardian began on June 9, 2009, by which time Mother had been drug-free for two

3

years.[1] The child custody evaluator who rendered the January 2008 report recognized Mother's "tremendous progress in her own life" and her love for the minor, but she believed Mother was more concerned with regaining custody of the minor than being a good parent. She was also uncertain whether the minor was comfortable with Mother and believed Mother was motivated by jealousy of Guardian and her relationship with the minor. The evaluator strongly recommended a permanent continuation of the guardianship because the minor had developed a strong relationship with Guardian and suffered anxiety over the uncertainty created by the possibility of the loss of his home. She saw Mother as a weekend parent, rather than a primary caretaker. The minor's long-time therapist reached a similar conclusion.

The probate court denied the petition to terminate the guardianship, but it expanded Mother's visitation rights, removed the requirement for supervision of visits, and increased Mother's role in the minor's everyday life, on condition Mother submit to periodic drug testing. The court told Guardian her "lack of flexibility" regarding visitation "is contrary to [the minor's] best interest" and warned her that an unwillingness to compromise "will play a part in perhaps accelerating a termination of a guardianship."

At the end of 2009, a new therapist appointed for the minor filed a letter report with the court. The therapist found the minor to be a "very fragile child" with a "major anxiety disorder." The therapist objected to a planned vacation with Mother, since the minor had expressed contempt for Mother and had "difficulty negotiating" the visits with Mother. The therapist concluded, "[Mother] seems to be working to overcome some of the harm that was done to her son in the past," but it was still "fresh in this child's psyche." Mother filed a declaration stating the minor was excited about the pending trip and attributed the minor's negative comments to the influence of Guardian. Mother believed Guardian's anxiety was "having a devastating impact on [the minor's] state of

---

[1] Although we refer to the trial court throughout as the "probate court," the judge who conducted this trial and subsequent contested proceedings, the Honorable Joyce Cram, was at the time the presiding judge of the family court.

4

mind and emotions." Minor's counsel supported the therapist. The court precluded the vacation and scheduled a status hearing.

At the hearing, in February 2010, the new therapist stated her concerns about the minor's fragility, but she conceded the interactions between Mother and the minor she had seen were positive. Following the therapist's testimony, the probate court denied an informal request by Mother's counsel to terminate the guardianship, saying, "the primary attachment is with the guardian, and . . . we need more time to increase the contact with [M]other and get over the hurt that was caused and the severe pain based on the prior relationship." The court reprimanded the parties for bickering rather than cooperating, telling Guardian, "[Y]ou are going to be the one responsible for making these transitions work. You're going to be the one that needs to decrease [the minor's] stress because[,] otherwise, I'm simply going to place him with his mom, and that will be devastating to him, but it will stop the aggravation between you and his mother." After directing increased visitation for Mother, the court warned, "[J]ust a reminder to both of you, you really need to work together. [The minor] is stressed, and he's picking up on the hostility between the two principal adults in his life. Don't do that to him."

A few months after this hearing, in May 2010, Mother filed another petition to terminate the guardianship, claiming a continued lack of cooperation from Guardian. In July, at the suggestion of the minor's counsel, a judge pro tem directed the parties to mediation. The mediation resolved a few issues, but the parties continued filing contentious declarations, and Mother did not withdraw her petition.

At a hearing in October 2010, the probate court set the petition for trial. In response to an objection by Guardian's counsel that Mother's petition failed to state a prima facie case for termination, the court responded, "But it may have. One of the things I made very clear is that if [Guardian] was interfering with the visitation, that I would find that this was directly contrary to the child's best interest and [that] would then encourage me to terminate the guardianship." The court initially set the matter for a half-day hearing, intending to determine from the parties' testimony whether Guardian was

5

being "rigid[] in visitation" and "making plans for [the minor] on mom's time without [consulting] with mom."

At the half-day hearing, in November 2010, only Mother testified. She said she was living in Napa, renting the bottom floor of a two-story home, and working as a waitress and an aerobics instructor. She had been drug-free for three years seven months. Mother described examples of lack of cooperation by Guardian in the scheduling of the minor's activities, often in conflict with Mother's visitation and without any advance consultation with Mother. When differences occurred, Guardian insisted on discussing them with Mother at the time of exchanges, in front of the minor, or electronically, rather than by telephone. She believed Guardian was inflexible and controlling with respect to her visitation. At the end of the hearing, the probate court precluded the parties from discussion of parenting issues in the minor's presence and required the parties to set a time for a weekly telephone call to discuss the minor's well-being and visitation logistics.

In testimony at the second day of trial, in March 2011, the minor's teacher and Guardian testified about the minor's friends, schooling, and activities under Guardian's care, including her involvement in the minor's school and his education. When Guardian began to explain her side of some of the conflicts described by Mother at the November hearing, the examination was cut short by the court, in an effort to avoid "minutiae." Guardian was permitted, however, to dispute Mother's claim not to have been consulted with respect to the minor's activities. Guardian believed the minor's visits with Mother were upsetting to him and was concerned Mother had done little to involve herself in the minor's daily life. Retaking the stand, Mother testified that her work schedule would permit her to act as a full-time parent to the minor during the coming summer.

At the close of evidence, the minor's counsel suggested the court suspend the guardianship for the summer, giving primary custody to Mother with visitation to Guardian. Although counsel recognized the minor's primary attachment was to Guardian, perhaps inevitably because she was his primary caretaker, counsel had concluded "it's time perhaps to think about a change."

6

The court began its ruling by noting, "The biggest problem for [the minor] is the conflict between [G]uardian and [M]other. As long as there's a guardianship in place, that conflict is going to be there and it is going to operate to the detriment of [the minor]." While recognizing the critical role played by Guardian in the minor's upbringing, the court noted his bond with Mother was strengthening. The court adopted the recommendation of the minor's counsel, suspending the guardianship for the summer and requiring the parties to develop a visitation plan for Guardian. While noting its intent to terminate the guardianship at the end of the summer if there were no "real problems that require continuation of the guardianship," the court cautioned Mother that the burden was now on her to cooperate with Guardian's visitation.

In preparation for the end-of-summer hearing, held August 9, 2011, Guardian filed pleadings seeking reinstatement of the guardianship and appointment of a child custody evaluator, contending the minor had not adjusted well to the change during the summer. Mother, in contrast, submitted a declaration stating the minor had done well in her care and had been admitted to a leading elementary school in Napa. The parties expanded on their positions in testimony at the hearing. The probate court continued to believe "[t]he conflict between Guardian and Mother is clearly affecting the child, has affected the child for a long time, and . . . keeping the Guardianship in place . . . fuels that conflict." As a result, "I find it necessary to terminate the Guardianship. . . . [A]nd I do believe that that is in the best interest of [the minor] because I believe that it will suspend/terminate the conflict." An order terminating the guardianship was filed in December 2011. The court subsequently denied Guardian's motion for an order vacating the termination and granting a new trial.

## II. DISCUSSION

Guardian contends the probate court abused its discretion in terminating the guardianship.

"[P]robate guardianships [are] an alternative placement [to the dependency statutes] for children who cannot safely remain with their parents. [Citation.] . . . Probate guardianships are not initiated by the state, but by private parties, typically family

members. . . . It is the family members and the guardians who determine, with court approval, whether a guardianship is established, and thereafter whether parent and child will be reunited, or the guardianship continued, or an adoption [by the guardian] sought under [Probate Code] section 1516.5. [¶] . . . The probate court may appoint a guardian 'if it appears necessary or convenient.' [Citation.] . . . A probate guardianship is often established with parental consent, as in this case. [Citations.] . . . [¶] Early authorities held that in contested guardianship cases, parents were entitled to retain custody unless affirmatively found unfit. [Citation.] However, the unfitness standard fell out of favor and the best interest of the child, as determined under the custody statutes, became the controlling consideration. [Citations.] The Probate Code now specifies that the appointment of a guardian is governed by the Family Code chapters beginning with section 3020 and 3040." (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1122–1123, fns. omitted (*Ann S.*).)

Although guardianship statutes expressly refer to the custody provisions of the Family Code only with regard to the establishment of a guardianship (Prob. Code, § 1514, subd. (b)), it is now well-established that they also provide a guide to the termination of a guardianship once established. (*Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 490 (*L.V.*); *Guardianship of Kassandra H.* (1998) 64 Cal.App.4th 1228, 1238–1239 (*Kassandra*).) Family Code section 3041 requires a showing of detriment before custody of a child can be granted to a nonparent (*id.*, subd. (a)), but the situation changes once custody has been transferred from a parent to a guardian. "Section 3041 further provides that if a preponderance of the evidence shows a nonparent has assumed the parental role for a substantial period of time by providing a stable home where the child's physical and emotional needs are met (i.e., a de facto parent), this establishes the required showing that nonparental custody is in the best interest of the child and that parental custody would be detrimental. (§ 3041, subds. (c), (d).) However, a parent may refute the evidence supporting custody with a de facto parent by showing by a preponderance of the evidence that there would be no detriment from parental custody

8

and that nonparental custody is not required to serve the best interest of the child." (*H.S. v. N.S.* (2009) 173 Cal.App.4th 1131, 1137.)

The basis for this "stable placement presumption" (*Guardianship of Vaughan* (2012) 207 Cal.App.4th 1055, 1073) afforded a successful guardianship was explained in *L.V.*: "Another factor that must be considered is the law's recognition of the importance of continuity and stability in a child's living arrangements. [Citations.] Thus, 'the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining ongoing custody arrangements.' [Citations.] This is true regardless of whether the ongoing custody arrangement was established by court order or by the consent of a noncustodial parent." (*L.V., supra*, 136 Cal.App.4th at p. 495.) Once a guardian has established the stable placement presumption, a parent seeking to terminate his or her child's guardianship must rebut the presumption that removal of the child from the stable placement would be detrimental and demonstrate affirmatively that the change in custody is in the child's best interests. (*H.S. v. N.S., supra,* 173 Cal.App.4th at p. 1137; *L.V.*, at p. 491.)

In evaluating a probate court's resolution of these issues, we largely defer to the court's judgment. "The decision whether to terminate a guardianship is committed to the sound discretion of the trial court. [Citations.] It is an inquiry that is particularly founded on application of the trial court's experience with human conduct. Thus, when the trial court applies the appropriate legal standard, its determination is subject to deferential review on appeal." (*L.V., supra*, 136 Cal.App.4th at p. 488.)

## A. *The Probate Court's Decision*

Applying this standard, we find no abuse of discretion in the probate court's termination of the guardianship. Before addressing the merits of the court's decision, we note the judge who entered the order terminating the guardianship, the Honorable Joyce Cram, had begun presiding over the proceedings at the June 2009 trial on the first petition to terminate. By the time she entered the order terminating the guardianship, Judge Cram had spent two years with both parties, observing their testimony on more than one

9

occasion, reviewing their submissions, and resolving the disputes that arose in the course of the guardianship. The decision was therefore the end of a two-year process of inquiry and evaluation by an experienced jurist, fully deserving of the deference we are required by our standard of review to give.

There was substantial evidence to support a finding that Mother had rebutted the stable placement presumption that removal of the minor from his guardianship placement would be detrimental. Importantly, from the minor's point of view, the placement had not been entirely successful. He was characterized by his therapist as a "fragile" child with a "major anxiety disorder," and he had persistent physical symptoms. Both the therapist and the probate court located the source of at least some of his problems in the nature of the guardianship placement. The minor had difficulty coping with the transitions between Mother and Guardian and the incessant conflict between them. Not only was Guardian unable to alleviate his anxiety, but the probate court had concluded Guardian was in part responsible for the anxiety-producing conflict. The court repeatedly cautioned Guardian to exercise more respect for Mother's visitation rights and minimize the minor's involvement in the conflict between them, but both the conflict and the minor's suffering persisted.

Further, there was no showing that the minor's attachment to Guardian was so strong that placing him with Mother would harm him. There is no dispute the minor's "primary attachment" was with Guardian, but as the minor's counsel recognized, this was an inevitable result of circumstances. Guardian had raised him from infancy, and his experience with Mother was limited. Notwithstanding this "primary attachment," however, he got along well with Mother and enjoyed his time with her. While she may have been incapable of caring for him earlier, by the time the termination order was entered Mother was self-supporting and had involved herself successfully in the minor's life. There was no evidence that transferring his attachment to Mother, in the context of a transfer of custody, would be psychologically harmful. On the contrary, by resolving the long-standing uncertainty caused by Mother's contest of the guardianship, the transfer held the possibility of relieving the minor's anxiety.

10

Similarly, substantial evidence supports the probate court's conclusion that the minor's best interests would be served by terminating the guardianship and placing him with Mother. The probate court was faced with resolving the difficult situation created by the inability of Mother and Guardian to cooperate with respect to the minor's care. In the years preceding the termination decision, Guardian had been unable, despite warnings from the court, to manage her relationship with Mother in a manner that did not result in harmful stress for the minor. Given the long period of conflict and its repeated warnings, the probate court had no reason to believe the situation would change if the guardianship continued. Rather, as Mother's role in the minor's life increased, as it naturally would, there was every reason to expect even more conflict. In addition, there was no testimony to suggest the minor was disturbed by the prospect of moving in with Mother. On the contrary, the testimony of Mother and other members of the extended family was that he enjoyed his mother and the time spent with her. Because Guardian was unable to manage the guardianship in a manner that did not create conflict harmful to the minor, the probate court could reasonably conclude terminating the guardianship and awarding custody to Mother was in his best interests.

**B. *The Need for Continuity***

Guardian first contends the probate court failed to consider the minor's need for stability and continuity in terminating the guardianship. We cannot agree. While the probate court never expressly cited the stable placement presumption, it clearly recognized the importance to the minor of stability. Beginning in 2009, two years before the termination of the guardianship, the probate court warned Guardian her "lack of flexibility" regarding visitation "is contrary to [the minor's] best interest" and suggested it could lead to a termination of the guardianship if not changed. Inherent in such a warning is the recognition of the desirability of maintaining the minor in Guardian's care; if the court had not recognized the need for stability, it would simply have terminated the guardianship. Yet while stability and continuity are important, they are not ends in themselves. A stable, stress-filled guardianship is of little value to an anxious ward. As

11

discussed above, the probate court concluded Guardian was unable to change her conduct in a manner that preserved the value of the long-standing placement.

Guardian argues the "duration of the guardianship alone militated against its termination," but this is contrary to the law. A guardianship of long duration is presumed valuable, but once that presumption is overcome, as it was here, the mere duration of the guardianship is of no legal significance.

In the same vein, Guardian argues the minor's "primary attachment" was to her. This alone, however, is irrelevant to the legal analysis. The existence of a primary attachment does not overcome the probate court's finding that the continued guardianship was emotionally unhealthy for the minor. Nor does it demonstrate the minor would be harmed by the need to shift his attachment to Mother.

## C. *Changed Circumstances*

Guardian next argues the probate court erred in terminating the guardianship "without a sufficient showing of changed circumstances." It is not clear a showing of changed circumstances is legally necessary for the termination of a guardianship. The requirement derives from cases decided prior to the amendment of the guardianship laws in 2002. (See *L.V., supra*, 136 Cal.App.4th at p. 490.) As amended, the Probate Code relating to termination requires the court only to consider the child's best interest, without requiring any change in circumstances. (Prob. Code, § 1601.) It is noteworthy that all of the cases cited by Guardian decided after these amendments address family law custody determinations, rather than guardianships.

In any event, the changed circumstances requirement, as it was articulated in *Kassandra,* is incorporated within the "best interest" analysis: "[N]ew circumstances justifying the termination of a guardianship must be sufficient to overcome the inherent disruption of tearing a child away from a guardian who is doing a good job of caring for and nurturing the child." (*Kassandra, supra*, 64 Cal.App.4th at p. 1239.) This is another way of stating the requirement that a parent challenging a guardianship must overcome the stable placement presumption.

12

Further, there is no question of changed circumstances here. The guardianship was instituted because, at the time of the minor's birth, Mother was a methamphetamine addict in an abusive domestic relationship who was incapable of caring for a child. She admitted as much, both expressly in court and implicitly by agreeing to the guardianship. By the time of the successful request for termination of the guardianship, Mother had long since ended the abusive relationship, was self-supporting in long-term employment, and had been confirmed drug-free through periodic testing for three years. Plainly, the circumstances existing at the creation of the guardianship had changed dramatically.

Guardian discounts this change, claiming the change in circumstances must affect the child. Assuming this to be true, this change plainly did affect the minor's life. As a result of his mother's transformation, the minor had a new adult presence in his life and the opportunity for active involvement with his natural parent. The inability of Guardian and Mother successfully to implement the visitation, however, created in the minor serious anxiety, significantly diminishing his quality of life.

## D. *The Presumption of Detriment*

Guardian also contends Mother failed to "overcom[e] the presumption of detriment associated with removing" the minor from a stable placement. It is not clear how this argument is legally different from her earlier contention that the probate court failed to consider the minor's need for stability and continuity, since the presumption derives entirely from that need. Like the earlier argument, Guardian's argument is based on her contention that the existing guardianship was successful, contrasted with the relative uncertainty of the minor's life with Mother. As discussed above, however, the existing guardianship was in some ways failing the minor, and the probate court was justified in concluding the change might address these failings. For the reasons discussed above, we conclude Mother overcame the stable placement presumption.

Guardian argues Mother failed to present affirmative evidence the minor would be better off with her or to rebut the evaluator's contrary opinion. On the contrary, Mother presented her own testimony that the minor was happy in her care. Others testified to similar observations. In light of Guardian's long-time failure to correct the problems in

the guardianship, the probate court was entitled to infer from this evidence that placement with Mother would be an improvement. Because the evaluator's opinion was three years old at the time of the termination and did not take account of the developments in Mother's relationship with the minor since 2009, the probate court was entitled to afford it less weight and was, in any event, not required to credit it. In the end, Guardian's argument in this regard is merely a claim the probate court erred in evaluating the evidence. Under the substantial evidence standard of review, we are precluded from reweighing the evidence.

## E. *Reliance on Dependency Law*

Guardian argues the probate court "inappropriately applied standards and objectives drawn from child dependency law," but there is no substance to the claim. The probate court plainly recognized its duty was to promote the minor's best interest, articulating that governing standard repeatedly during the proceedings.

Guardian's argument is premised on the probate court's efforts at increasing Mother's role in the minor's life, particularly as her competency increased. As Guardian points out, the guardianship laws, unlike the dependency statutes, do not establish parental reunification as a goal. (See *Guardianship of Christian G.* (2011) 195 Cal.App.4th 581, 596–602 [comparing the dependency and guardianship statutes].) Neither, however, do the guardianship statutes exclude reunification. When the " 'parent or parents are not likely to reclaim the child,' " the guardianship laws permit the court to terminate a parent's rights in a child. (*Ann S., supra,* 45 Cal.4th at p. 1125; Prob. Code, § 1516.5) In the absence of such a termination, the probate court has "discretion to grant visitation" (*Ann S.*, at p. 1123), and it is only natural and appropriate for the probate court to increase and relax the terms of visitation when a parent proves capable, as Mother did, of her role. We find no abuse of discretion in the probate court's effort to increase Mother's role in the minor's life.[2]

---

[2] In her reply brief, Guardian complains the probate court's visitation rulings had the effect of "impermissibly grant[ing mother] virtually all the rights of legal parenthood." A review of the record reveals this to be undisciplined hyperbole, but even

14

Guardian argues the "guardianship should [have been] made permanent for the sake of [the minor's] mental health and psychological stability," but the law does not provide for this type of irrevocable guardianship. Rather, a guardian who seeks permanent custody of a ward must make a motion under Probate Code section 1516.5 to terminate parental rights and allow adoption. Because no motion under section 1516.5 was ever made, the probate court cannot be faulted for failing to grant it.

Guardian also argues the probate court "improperly placed the burden of proof upon [Guardian] to affirmatively prove her 'flexibility.' " The argument badly mischaracterizes the probate court's actions. The probate court did not place any "burden of proof" on Guardian. Rather, as discussed above, the court warned Guardian she was failing the minor by fostering of conflict with Mother. The probate court in no way abused its discretion in warning Guardian her failures could lead to a termination of the guardianship.

**F.** *The Conflict*

Guardian contends the probate court erred in "focus[ing]" on the conflict between her and Mother. Contrary to Guardian's argument, however, substantial evidence supported the probate court's conclusion that the continuing disputes were a source of anxiety for the minor, interfering with his psychological well-being. Guardian seeks to minimize the disputes as an "alleged 'conflict,' " but the use of quotation marks is entirely unwarranted. The record reveals the probate court as a battleground on which Mother and Guardian fought constantly over control of the minor for six years. Even a cursory reading reveals the deep dislike and distrust between them, running in both directions with apparently equal intensity. As discussed above, there was consistent, credible evidence the minor suffered anxiety in connection with the transitions between their care. It begins with the evaluator's report in 2008 and runs through Guardian's own testimony at the August 2011 termination hearing, when she said that transitions between

---

if true it would have no bearing on the propriety of the probate court's exercise of discretion in terminating the guardianship.

15

her home and Mother's were "really difficult" for the minor, causing sleeplessness and nausea. While Guardian attributed the minor's reaction to a dislike of spending time with Mother, it was noted by observers and participants alike that the minor enjoyed his time with Mother and her family. The probate court could properly conclude the minor's suffering was caused not by his feelings toward his mother but by the stress associated with attempting to negotiate the conflict between the two most important people in his life. Even if, as Guardian argues, the probate court wrongly evaluated the evidence in this regard, the standard of review precludes us from reweighing it.

Guardian argues the probate court erred in focusing on the conflict to the exclusion of the minor's well-being, but the probate court was not disregarding the minor's well-being in focusing on this conflict. Rather, it viewed the conflict as a substantial barrier to the minor's well-being. We see no abuse of discretion in the probate court's insight, which was supported by the opinions of the evaluator and therapist.

Guardian next faults the probate court for allowing Mother to play a role in the minor's life, arguing she should have had complete control over his upbringing. (E.g., *Ann S., supra,* 45 Cal.4th at p. 1124 ["parental rights are completely suspended for the duration of a probate guardianship"].) While Guardian had control over the minor, Mother had legitimate rights to visitation that had to be accommodated within the context of Guardian's control. We find no abuse of discretion in the manner in which the probate court resolved the conflict created by these competing rights. Contrary to Guardian's claim, Mother's visitation rights were not allowed to "undercut" the guardianship.

Guardian contends "terminating the guardianship was a draconian 'solution' to a 'problem' largely manufactured by [Mother]" and suggests the probate court could have adopted other approaches, such as mediation or joint counseling. The probate court was under no legal obligation to adopt such half-measures, particularly after three years of relatively constant conflict, and Guardian cites no legal authority suggesting such an obligation.

Guardian also contends the probate court abused its discretion because the evidence suggested Guardian would provide more frequent and continuing contact with Mother than vice versa. Because Guardian had squandered several years in which to demonstrate her ability to regulate visitation successfully, this is a difficult argument to make convincingly. In any event, there are many considerations which factor into a "best interest" calculation, and we find no abuse of discretion in the probate court's decision not to give this factor predominant weight.

Guardian claims the conflict between the parties alone cannot provide the basis for making a custodial change, citing *F.T. v. L.J.* (2011) 194 Cal.App.4th 1. In that case, which reviewed the denial of a move-away order for the child of unmarried natural parents, the court held the trial court misapplied the proper standard for ruling on such a motion by failing to consider the child's best interests, focusing instead on the reasons for the move and the potential impact on the parent left behind, among other issues. (*Id.* at pp. 21–24.) Contrary to Guardian's characterization of the case, the appellate court did not reverse the trial court's ruling because it focused only on one factor; it reversed because the trial court focused on issues unrelated to the child's best interests. In this case, the probate court unquestionably understood its duty to address the minor's best interests and acted in furtherance of its understanding of those interests. Unlike the factors found improper in *F.T.*, the conflict was highly relevant to the minor's best interests, for the reasons discussed above. The court did not terminate the guardianship in order to address the conflict between the parties; it terminated the guardianship in an effort to achieve peace for the minor, whose well-being was disrupted by the conflict. To the extent Guardian contends the change is not in the minor's best interests, we find no abuse of discretion in the probate court's contrary determination.

## G. *The Absence of Neutral Third Party Testimony*

Guardian argues the probate court abused its discretion in terminating the guardianship in the absence of testimony by neutral professionals. She also faults the court's decisions to grant minor's counsel's request to withdraw in anticipation of

17

retirement in June 2011, prior to the final hearing, and to deny the request for the appointment of a custody evaluator.

Guardian first argues the probate court's order terminating the guardianship lacked a proper evidentiary basis because there was no testimony from a "neutral third party" regarding the minor's best interests. Contrary to Guardian's claim, the absence of such an evaluation did not cause the court's ruling to "rest[] on speculation." As detailed above, the probate court presided over two separate trials and spent two years mediating the disputes of the parties, all of which generated a wealth of admissible evidence bearing on the minor's well-being. The probate court's ruling was well-grounded in this evidence.

Nor do we find an abuse of discretion in the probate court's decision to allow minor's counsel to withdraw and decline the request for appointment of a custody evaluator. As Guardian acknowledges, the court was under no legal obligation to appoint minor's counsel. Similarly, there was no legal requirement of a custody evaluation; the decision is entirely within the court's discretion. (Fam. Code, § 3111, subd. (a).) Because of the court's long experience with the matter, it could properly conclude the assistance of these professionals was unnecessary.

Guardian also contends the probate court erred in failing to take the minor's wishes into account. (See Fam. Code, § 3042, subd. (a).) Because there was no evidence introduced to support a finding the minor was "of sufficient age and capacity to reason so as to form an intelligent preference as to custody" (§ 3042, subd. (a)), the foundation for such testimony was lacking. At seven years old, and suffering under the demands of his two parental figures, it is by no means self-evident the minor was in a position to offer meaningful testimony about his custody wishes.[3] In any event, Guardian waived this argument when she failed to raise it below.

---

[3] Subdivision (c) of Family Code section 3042, which became effective in 2012, grants a child of 14 years or older the right to address the court regarding custody. While this is by no means determinative as to age of competence, it suggests a child of seven

**H.** *"Irregularity" in the Proceedings*

Finally, Guardian contends she was denied due process because of "irregularity in the proceedings."

Guardian first argues the probate court violated her right to due process by prejudging the termination decision, based on the court's comment when it granted the minor's counsel's request to withdraw as a result of her impending retirement: "The guardianship is over. The visitation is proceeding, so I don't know that . . . [¶] . . . [¶] . . . the child needs any more attention by you." We do not view this comment as evidence of a prejudgment. The probate court had already announced its intention to terminate the guardianship the prior March if the summer experiment with Mother's care proved successful. We take the court's comment to refer to that tentative decision. Consistent with its ruling, however, the court waited until after the hearing in August to make a final decision.

The cases cited by Guardian in support of her argument generally involve the premature termination of a proceeding, prior to the presentation of all relevant evidence. (E.g., *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357–1358; *In re Marriage of Straczynski* (2010) 189 Cal.App.4th 531, 539.) Regardless of the views expressed by the probate court about the likely outcome of the termination proceedings in June, the court waited until after the presentation of evidence at the August hearing before making its final decision. Its judgment was not legally premature.

Guardian next claims the probate court improperly excluded rebuttal evidence regarding disputes between her and Mother at the March 2011 hearing. We review a trial court's exclusion of evidence for abuse of discretion. (*Cordero-Sacks v. Housing Authority of City of Los Angeles* (2011) 200 Cal.App.4th 1267, 1281.) As the probate court explained at the time, it had concluded the minor's anxiety was being caused by the dispute between the parties over the guardianship. The exact nature of the conflicts and

---

years cannot be assumed competent to make a determination as to his desires, let alone his interests.

19

their source were, as the court suggested in labeling them "minutiae," of little relevance to its decision with respect to the disposition of the guardianship. We find no abuse of discretion in this conclusion.

In any event, we find no prejudice in the exclusion of this evidence. Despite the probate court's initial ruling, Guardian was permitted to testify about some of the conflicts. Further, it is not likely the probate court's decision would have been different if Guardian had been permitted to tell her side of the story regarding the remainder of these disputes. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

### III. DISPOSITION

The probate court's order terminating the guardianship is affirmed.

_____
Margulies, Acting P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.