[No. F039600. Fifth Dist. Oct. 17, 2002.]

ERASMO ZASUETA et al., Plaintiffs and Respondents, v.
STEPHANIE ZASUETA, Defendant and Appellant.

COUNSEL

Kilpatrick & White and Michael R. Kilpatrick for Defendant and Appellant.

Law Office of Tasha M. Bollinger and Tasha M. Bollinger for Plaintiffs and Respondents

OPINION

WISEMAN, J.—Some cases hit closer to home than others. Deciding whether grandparents should have visitation with their grandchildren over the objection of a parent is the type of case that tugs at the hearts of most trial judges, evoking memories of personal experiences with their own families—both good and bad. As a result, the temptation seems to be (more than in other types of cases) to allow the heart to rule over the letter of the law. It is for this reason that we publish here: to remind our district's able trial bench of the law governing these emotionally difficult cases and the need to set aside personal feelings and experiences when making these rulings.

Stephanie Zasueta, mother of the minor child (the minor child), appeals an order granting visitation to the minor child's paternal grandparents, Erasmo

and Cynthia Zasueta,[1] under Family Code[2] section 3102. Stephanie contends section 3102 is unconstitutional, both facially and as applied. We conclude section 3102, as applied in this case, unconstitutionally infringed on Stephanie's fundamental rights. Accordingly, we reverse the order in its entirety.

### FACTUAL AND PROCEDURAL HISTORIES

Stephanie and Paul Zasueta were married sometime in 1998. On February 28, 1999, Stephanie gave birth to the minor child. Stephanie and Paul separated the following year. They were in the process of obtaining a marital dissolution when Paul committed suicide on June 13, 2001.

On September 7, 2001, the Zasuetas filed a petition in superior court requesting visitation with the minor child. Stephanie opposed the petition. A hearing was held on October 16, 2001.

During the hearing, Cynthia testified that before her stepson Paul died she saw the minor child about every other weekend. Paul would usually bring the minor child over to visit with the Zasuetas on Saturdays at their car wash business in Bakersfield. The visits would last two to three hours. The minor child never spent the night at their home. However, they occasionally would go out to eat pizza together.

Cynthia stated that she had not been able to visit with the minor child since Paul's death. She had called Stephanie at work about two months afterward and asked whether they would be able to see the minor child. Stephanie told her that "it wasn't the right time." When Cynthia asked why, Stephanie said they first needed to " 'sort out things' " regarding Paul's personal belongings. Cynthia then told Stephanie to " '[g]ive us yes or no if you will let us see her.' " Stephanie repeated that she did not think it was the right time and indicated she would not allow any visitation with the minor child until some of Paul's belongings were returned to her.

Cynthia testified that she and Erasmo lived in a mobilehome behind their car wash business. According to Cynthia, their home was clean and suitable for a two year old to visit. Cynthia denied there was "drinking and swearing going on constantly." She was not aware that Stephanie had ever spent time inside her home to be able to observe such behavior.

Cynthia indicated that the minor child was Paul's only child. However, she had other grandchildren, including a three-year-old grandson and a

---

[1]To avoid confusion, we refer to the parties by their first names and, where appropriate, collectively refer to Erasmo and Cynthia as the Zasuetas.

[2]All statutory references are to the Family Code unless otherwise noted.

one-year-old granddaughter. According to Cynthia, these grandchildren visited during the weekends and sometimes spent full days or spent the night at the Zasuetas' home. Cynthia explained that she had beds for them to sleep in, and their parents would bring high chairs or whatever else they needed.

On cross-examination, Cynthia acknowledged that Stephanie was a good mother. Cynthia also confirmed that, although she did not agree with Stephanie's decisions, she had no grounds for suggesting that Stephanie would do anything other than what she believed was best for the minor child.

Erasmo testified that he occasionally drank alcohol when he got off from work. However, he did not drink around his grandchildren. Erasmo loved his grandchildren and played with them when they visited. He also agreed with Cynthia's testimony regarding their past contact with the minor child.

Stephanie testified that after Paul died, members of his family, including Cynthia, would call and accuse her of saying or doing something to cause Paul to commit suicide. As a result, Stephanie tried to avoid the Zasuetas.

Stephanie further testified that, prior to the separation, she used to go with Paul to visit the Zasuetas at their previous homes in Bakersfield and Tehachapi. During these visits, Stephanie observed members of Paul's family drinking alcohol excessively and becoming loud and boisterous. According to Stephanie, Erasmo swore, using "[t]he 'F' word a lot; bitch and beaver." Stephanie testified she did not want the minor child to be around alcohol or any individual who used such language. She further stated that Paul spoke like his father when they first started dating, but he never spoke in that manner around the minor child.

Stephanie testified that she "definitely" thought the minor child should, at some point, spend time with the Zasuetas. However, she currently objected to visitation because she believed it would be traumatizing for the minor child. Stephanie explained that before Paul died, the Zasuetas only visited once every three or four months. When they came over, it would take a couple hours for the minor child to get used to them. Stephanie was also concerned about the feelings the Zasuetas would express about Paul's death and the minor child's physical resemblance to him.

Stephanie did not know where Paul took the minor child on his visitation days. She had told Paul not to take the minor child to his parents' home because "[the minor child] came back upset, tantrums and dirty."

On cross-examination, Stephanie testified that, although it might be important to the Zasuetas to have a continuing relationship with their grandchildren, it was not necessarily important to the minor child, who would not

know the difference. Stephanie explained that the minor child had a close relationship with Stephanie's parents and received "plenty of love." Stephanie indicated that visitation with the Zasuetas would be acceptable when the minor child "gets older and understands what happened and wants to, that is her decision."

Stephanie testified regarding another source of animosity between herself and the Zasuetas. She explained that after Paul died, the Zasuetas took all his personal belongings, including his watch, wedding band, cologne, clothing, and home videos. Stephanie felt the Zasuetas had acted disrespectfully toward the minor child by leaving her without anything to remind her of her father. Stephanie indicated she would be willing to allow some visitation, "[m]aybe limited to a couple hours a month," if the Zasuetas would be helpful in resolving the issues pertaining to Paul's belongings.

After listening to argument from both sides, the court ruled in favor of granting visitation to the Zasuetas. The court's reasoning in support of this ruling is reflected in the following discussion:

"THE COURT: An analysis of the reaction and testimony of the mother of this child reflect to this court that she agrees this child should spend some time with the grandparents.

"Her response to the question in this proceeding when she said a day is too long, by implication there is some time less than a day that is not too long. I don't know; maybe I got spoiled because I had grandparents that I dearly enjoyed spending time with from the time I could walk until, as a matter my grandparents owned a chocolate store and gave away chocolate and ice cream and grandparents do those sort of things.

"I know with my seven grandchildren today all living here in Bakersfield, my wife—especially my wife does the best she can to spoil those kids and that is what grandparents should do and that is what grandchildren should expect grandparents to do and, therefore, it makes it very difficult for me to make a finding in a case like this there is not to be a continuing relationship between a grandparent and a child.

"I think by virtue of analyzing the testimony of your client that she would agree at least by implication she has agreed there should be some time spent with the child by the grandparents.

"MR. KILPATRICK [Stephanie's counsel]: She said some time in the future.

"THE COURT: When they are 27?

"MR. KILPATRICK: I don't know that, your Honor.

"THE COURT: That is wrong. That relationship should start today when this child is two plus years old and continue. Certainly these allegations of drinking and swearing the court has to take with a grain of salt when that information is provided.

"The fact that the home is not clean, that is significant an allegation but apparently there are other grandchildren that spend time with these folks and that time can be spent with them in other situations.

"MR. KILPATRICK: Your Honor, that is because the other parents make that choice.

"THE COURT: This court is going to make a choice. This court is going to make a choice that it is appropriate for this relationship to continue and I would certainly agree with Stephanie that a day is a long time with a two-year-old and not appropriate at this point in time. I think what is appropriate is a visitation plan.

"A couple times a month maybe, and just to identify maybe the first and third weekend of each month starting out with one hour visitation. . . . [I]n the meantime these folks have to get their head out of the sand and straighten the relationship around and to not have a relationship between a daughter-in-law and her deceased husband's parents is ridiculous. That is the kind of relationship that should be fostered and not ignored and both sides of this process need to address that issue in their own thoughts. [¶] . . . [¶]

"MR. KILPATRICK: Will the court then make a finding that my client is an unfit parent? You have to do that.

"THE COURT: I am not going to do that. She is unfit if she continues to maintain a position that her child cannot develop a relationship with her grandparents so in that regard, yes, she is unfit. I don't think she is unfit in other ways.

"She is an intelligent and attractive young lady and I cannot go back and undo what has been done in her life. These folks have to get on and not make detrimental comments to her about causing her husband to take his life or whatever. That is a subject that needs to be ignored.

"MR. KILPATRICK: Is the court saying there is clear and convincing evidence it would be detrimental to the child because my client objects to the visitation.

"THE COURT: No, it is the relationship that this child is deprived of because of that attitude. Come back in six months. We will set a date today for further hearing and review of this matter."

On October 31, 2001, the court entered its order on the Zasuetas' petition, compelling "visitation to occur on the [first] and [third] Saturdays of each month for a period of [one] hour, then six months later increase to [one and one-half] hours, then six months later increased to [two] hours." In so ordering, the court made the following finding: "1. The **Biological Mother, Stephanie Zasueta, is Unfit.** The Court hereby finds that the biological mother's decision to not continue or foster a relationship between the paternal grandparents and the subject minor by objecting to grandparent visitation in and of itself, at least as far as that decision is concerned, is the decision of an unfit mother. The Court further finds that in other areas of parenting that Stephanie Zasueta is a fit mother, however, as to the objection to grandparent visitation the Court finds that said objection is in and of itself, inherently an unfit decision and, therefore, as to that decision alone, Stephanie Zasueta is an unfit mother."

On December 19, 2001, Stephanie timely filed her notice of appeal challenging the court's ruling. On January 16, 2002, we granted Stephanie's petition for a writ for supersedeas, staying enforcement of the visitation order pending resolution of the appeal.

DISCUSSION

The court granted the Zasuetas visitation with the minor child pursuant to section 3102, which provides:

"(a) If either parent of an unemancipated minor child is deceased, the children, siblings, parents, and grandparents of the deceased parent may be granted reasonable visitation with the child during the child's minority upon a finding that the visitation would be in the best interest of the minor child.

"(b) In granting visitation pursuant to this section to a person other than a grandparent of the child, the court shall consider the amount of personal contact between the person and the child before the application for the visitation order.

"(c) This section does not apply if the child has been adopted by a person other than a stepparent or grandparent of the child. Any visitation

rights granted pursuant to this section before the adoption of the child automatically terminate if the child is adopted by a person other than a stepparent or grandparent of the child."

Stephanie contends section 3102 is facially unconstitutional because it interferes with a liberty interest protected by the Fourteenth Amendment of the United States Constitution and violates the right to privacy set forth in the California Constitution. (Cal. Const., art. I, § 1.) We need not decide whether section 3102 is unconstitutional on its face because its application here unconstitutionally infringed upon fundamental parenting rights protected by the due process clause of the Fourteenth Amendment.

## I. *Background*

The controlling case authority is *Troxel v. Granville* (2000) 530 U.S. 57 [120 S.Ct. 2054, 147 L.Ed.2d 49] (*Troxel*). In *Troxel*, the parents of the deceased father of two girls were granted increased visitation pursuant to an order under Washington's nonparental visitation statute. The statute allows any person to petition the court for visitation rights at any time and provides vistitation rights may be granted to any person when it may serve the child's best interest. The Washington statute provides: " 'Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.' " (*Troxel, supra,* 530 U.S. at p. 61 [120 S.Ct. at pp. 2057-2058], quoting Wash. Rev. Code § 26.10.160(3).) The children's mother in *Troxel* had sought to limit the grandparents' visitation to once a month. However, the trial court found more extensive visitation was in the children's best interest even though there were no allegations or findings the mother was an unfit parent. (*Troxel, supra,* 530 U.S. at pp. 61, 68 [120 S.Ct. at pp. 2057-2058, 2061].)

The Washington Supreme Court reversed the trial court's order, holding the nonparental visitation statute unconstitutionally infringed on the fundamental right of parents to rear their children. (*Troxel, supra,* 530 U.S. at p. 62 [120 S.Ct. at p. 2058].) The Washington Supreme Court identified two infirmities in the statute which, in its view, rendered the statute facially invalid: (1) "the failure of the statute to require harm to the child to justify a disputed visitation order," and (2) "the statute's authorization of 'any person' at 'any time' to petition for and to receive visitation rights subject only to a free-ranging best-interests-of-the-child standard . . . ." (*Id.* at p. 76 [120 S.Ct. at pp. 2065-2066] (conc. opn. of Souter, J.).)

The United States Supreme Court affirmed. A plurality of the high court held the Washington statute was unconstitutional as applied to the circumstances of that case.[3] After citing extensive precedent, the plurality recognized that the due process clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. (*Troxel, supra*, 530 U.S. at p. 66 [120 S.Ct. at p. 2060].) The plurality then held that the Washington statute, as applied, unconstitutionally infringed on that fundamental parental right. We quote extensively from the plurality's reasoning to shed light on our conclusion that section 3102, as applied to the facts of this case, unconstitutionally infringed upon Stephanie's fundamental right as a parent to make decisions concerning the care, custody, and control of the minor child.

"The Washington nonparental visitation statute is breathtakingly broad. According to the statute's text, '[*a*]*ny person* may petition the court for visitation rights *at any time*,' and the court may grant such visitation rights whenever 'visitation may serve *the best interest of the child.*' [Citation.] That language effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review. Once the visitation petition has been filed in court and the matter is placed before a judge, a parent's decision that visitation would not be in the child's best interest is accorded no deference. . . . Should the judge disagree with the parent's estimation of the child's best interests, the judge's view necessarily prevails. Thus, in practical effect, in the State of Washington a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests. . . .

"Turning to the facts of this case, the record reveals that the Superior Court's order was based on precisely the type of mere disagreement we have just described and nothing more. The Superior Court's order was not founded on any special factors that might justify the State's interference with Granville's fundamental right to make decisions concerning the rearing of her two daughters. . . . [T]he combination of several factors here compels

---

[3]Justice O'Connor announced the judgment of the court and delivered the court's opinion, joined by the Chief Justice, Justice Ginsburg, and Justice Breyer. Justice Souter concluded the Washington Supreme Court's second reason for invalidating the nonparental visitation statute provided a sufficient basis for upholding the judgment. (*Troxel, supra*, 530 U.S. at pp. 75-79 [120 S.Ct. at pp. 2065-2067] (conc. opn. of Souter, J.).) Justice Thomas agreed that the plurality's recognition of a fundamental right of parents to direct their children's upbringing resolved the case, but concluded that strict scrutiny was the appropriate standard of review. (*Id.* at p. 80 [120 S.Ct. at pp. 2067-2068] (conc. opn. of Thomas, J.).) Justice Stevens, Justice Scalia, and Justice Kennedy filed separate dissenting opinions.

our conclusion that [the Washington nonparental visitation statute], as applied, exceeded the bounds of the Due Process Clause.

"First, the Troxels did not allege, and no court has found, that Granville was an unfit parent. That aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children. . . . Accordingly, so long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children. [Citation.]

"The problem here is not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to Granville's determination of her daughters' best interests. More importantly, it appears that the Superior Court applied exactly the opposite presumption. . . . "The judge's comments suggest that he presumed the grandparents' request should be granted unless the children would be 'impact[ed] adversely.' In effect, the judge placed on Granville, the fit custodial parent, the burden of *disproving* that visitation would be in the best interest of her daughters. . . .

"The decisional framework employed by the Superior Court directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child. [Citation.] In that respect, the court's presumption failed to provide any protection for Granville's fundamental constitutional right to make decisions concerning the rearing of her own daughters. . . .

"Finally, we note that there is no allegation that Granville ever sought to cut off visitation entirely. Rather, the present dispute originated when Granville informed the Troxels that she would prefer to restrict their visitation with Isabelle and Natalie to one short visit per month and special holidays. . . . Significantly, many other States expressly provide by statute that courts may not award visitation unless a parent has denied (or unreasonably denied) visitation to the concerned third party. [Citations.]

"Considered together with the Superior Court's reasons for awarding visitation to the Troxels, the combination of these factors demonstrates that the visitation order in this case was an unconstitutional infringement on Granville's fundamental right to make decisions concerning the care, custody, and control of her two daughters. . . ." (*Troxel, supra,* 530 U.S. at pp. 67-72 [120 S.Ct. at pp. 2061-2063].)

In finding application of the Washington statute unconstitutional, the high court left several issues unresolved. Although calling for deference or

special weight to be given to a parent's decision regarding visitation, *Troxel* did not define how much deference is required, nor did it announce the standard of review that should be applied in protecting the parent's liberty interest in visitation matters. (*Troxel, supra*, 530 U.S. at pp. 73-74 [120 S.Ct. at p. 2064].) The plurality commented, however, "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied . . . . Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter." (*Id.* at p. 73 [120 S.Ct. at p. 2064].)

Under the principles announced in *Troxel*, we find that application of section 3102 in this case violated Stephanie's fundamental right under the due process clause to make decisions regarding the custody, care, and control of the minor child.

## II. *Analysis*

As a preliminary matter, we address the Zasuetas' suggestion that *Troxel* is inapplicable because, unlike the Washington statute, the language of section 3102 is not "breathtakingly broad." (*Troxel, supra*, 530 U.S. at p. 67 [120 S.Ct. at p. 2061].) The Zasuetas note section 3102 applies only to close relatives of a deceased parent. Unlike the Washington statute analyzed in *Troxel*, section 3102 does not allow " '[*a*]*ny person*' " to petition for visitation at " '*any time.*' " (*Troxel*, at p. 67 [120 S.Ct. at p. 2061].)

The identical argument was recently rejected by the Fourth District Court of Appeal, Division One, in *Punsly v. Ho* (2001) 87 Cal.App.4th 1099 [105 Cal.Rptr.2d 139]. The court explained: "The [grandparents'] emphasis on 'the sweeping breadth' of Washington's statute is misplaced. Undoubtedly, section 3102 provides greater restrictions on who may petition for visitation and when. However, similar to the Washington statute, section 3102 authorizes a court to grant such visitation to a child's grandparents solely upon finding it is in the best interests of the child. It is when a court exercises this discretion to substitute its own judgment of a child's best interests for that of a competent custodial parent, that a parent's fundamental rights are threatened. . . . This injection of the state's judgment into the affairs of a fit parent, not the details of the statute authorizing such an intrusion, fueled the *Troxel* opinion. (*Troxel, supra*, 530 U.S. 57 [120 S.Ct. 2054].)" (*Punsly v. Ho, supra*, 87 Cal.App.4th at pp. 1106-1107; see also *Kyle O. v. Donald R.* (2000) 85 Cal.App.4th 848 [102 Cal.Rptr.2d 476] [trial court's application of § 3102 unconstitutional under *Troxel*].) We agree with the court's well-reasoned conclusion that *Troxel*'s analysis is applicable to section 3102.

The trial court's application of section 3102 in this case contravened the constitutional principles set forth in *Troxel*. In determining visitation, the court did not apply the requisite presumption that Stephanie, as a fit parent, would act in her child's best interests. In making this observation, we recognize the court concluded Stephanie was an unfit parent based on her decision not to allow grandparent visitation. We disagree with the court's finding. The Zasuetas did not allege or present evidence that Stephanie did not properly care for the minor child and was thus an unfit parent. In fact, Cynthia testified that Stephanie was a good mother and she had no reason to believe Stephanie would not act in the minor child's best interests. The court's finding of unfitness was erroneously based on the assumption that grandparent-grandchildren relationships *always* benefit children. "In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case *is for the parent to make in the first instance*. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." (*Troxel, supra,* 530 U.S. at p. 70 [120 S.Ct. at p. 2062], italics added.)

Although the record supported a finding of parental fitness, the court "failed to accord the determination of [Stephanie], a fit custodial parent, any material weight." (*Troxel, supra,* 530 U.S. at p. 72 [120 S.Ct. at p. 2063].) Instead, the court dismissed Stephanie's reasons for restricting visitation. For example, Stephanie expressed concern regarding the use of alcohol and inappropriate language in the Zasueta household. Without elaboration, the court commented that it took "these allegations of drinking and swearing . . . with a grain of salt." Although the court acknowledged Stephanie's concern regarding the cleanliness of the Zasuetas' home, the court accorded greater weight to the decision made by the parents of the Zasuetas' other grandchildren to allow visits. Finally, the court did not address Stephanie's observations that the minor child exhibited uneasiness around the Zasuetas, or that she would be dirty and throw tantrums when she returned from visits to their home.

In ordering visitation, the court did not give deference to Stephanie's view of the minor child's best interests but rather applied its own subjective beliefs and experiences regarding the importance of grandchild-grandparent relationships. The court's analysis thus resembled that of the trial court in *Troxel*. In granting visitation, that court commented: " 'I look back on some personal experiences . . . . We always spen[t] as kids a week with one set of grandparents and another set of grandparents, [and] it happened to work

out in our family that [it] turned out to be an enjoyable experience. Maybe that can, in this family, if that is how it works out.' " (*Troxel, supra,* 530 U.S. at p. 72 [120 S.Ct. at p. 2063].) After quoting the above comments, the *Troxel* plurality concluded: "As we have explained, the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions *simply because a state judge believes a 'better' decision could be made.* Neither the Washington nonparental visitation statute generally—which places no limits on either the persons who may petition for visitation or the circumstances in which such a petition may be granted—nor the Superior Court in this specific case required anything more. Accordingly, we hold that § 26.10.160(3), as applied in this case, is unconstitutional." (*Troxel, supra,* 530 U.S. at pp. 72-73 [120 S.Ct. at pp. 2063-2064], italics added.)

The trial court's failure to accord any "special weight" to Stephanie's child-rearing decision resulted in an order based on "nothing more" than a disagreement between the court and Stephanie concerning the minor child's best interests. (*Troxel, supra,* 530 U.S. at p. 68 [120 S.Ct. at p. 2061].) The court's "announced presumption in favor of grandparent visitation" effectively placed the evidentiary burden on Stephanie to show the visitation was not in the minor child's best interests. (*Id.* at p. 72 [120 S.Ct. at p. 2063].) This error violated not only constitutional principles, but also the language of section 3102, which permits visitation where there has been a finding that visitation is in a child's best interests. Here, there was no such finding. Instead, the court presumed grandparent visitation was beneficial and, based on this presumption, made a finding that Stephanie was an unfit parent. For the reasons discussed, this was not a proper basis for the court's visitation order.

Finally, we are not persuaded by the Zasuetas' contention that *Troxel* weighs in favor of the court's order because Stephanie was opposed, for the time being, to any visitation with the grandparents. It is true the *Troxel* plurality faulted the trial court for not giving any weight to the mother's "having assented to visitation even before the filing of any visitation petition or subsequent court intervention." (*Troxel, supra,* 530 U.S. at p. 71 [120 S.Ct. at p. 2063].) However, we do not read this to mean that, whenever a parent expresses opposition to grandparent visitation, this opposition should automatically be considered a factor in favor of visitation. Such an interpretation contradicts *Troxel*'s central holding that a fit parent's decision regarding visitation should be given deference, and that the burden is on the grandparents, not the parent, to show visitation is in a child's best interest.

Moreover, *Troxel* emphasizes that the determination of whether a nonparental visitation statute has been constitutionally applied is to be made on a

case-by-case basis. The fact the mother in *Troxel* was willing to allow some visitation is not what made the court's application of the statute unconstitutional. The trial court's failure to give the mother's preference any weight and the substitution of its own best interest determination constituted the error that violated the mother's fundamental parenting right to make decisions regarding the custody, care, and control of her child. Similarly, in this case, Stephanie's preference not to allow visitation was entitled to deference. At the very least, *Troxel* teaches that trial courts must resist the temptation to personalize the proceedings and to substitute personal judgments for the decisions made by fit parents regarding visitation.

In light of Stephanie's fitness as a parent and the court's erroneous presumption that visitation with the Zasuetas was in the minor child's best interests, we conclude the application of section 3102 unduly infringed upon Stephanie's fundamental parenting rights. (*Troxel, supra,* 530 U.S. at pp. 69-70 [120 S.Ct. at p. 2062].) For this reason, the order is reversed.

As revealed during oral argument, there is no dispute between Stephanie and the Zasuetas that this matter must be reversed. The only difference of opinion pertains to what happens next. Stephanie contends that remand is inappropriate, arguing that a new petition may be filed upon a showing of changed circumstances. The Zasuetas urge remand for further hearing on the petition. Both sides agree the matter should be heard by a different trial judge. Under the circumstances, we agree with the Zasuetas and order remand on this petition to be heard before a different trial judge. Both sides are entitled to have their cases evaluated pursuant to the correct legal standard. Since this has not yet occurred, we remand the petition for a new hearing on the merits.

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions to vacate its order granting the Zasuetas' request for visitation. Upon timely request, the petition shall be reheard before a different trial judge. Costs are awarded to Stephanie Zasueta.

Vartabedian, Acting P. J., and Harris, J., concurred.