Filed 7/22/25; Certified for Publication 8/21/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CYNTHIA BALANDRAN et al., | B335531 |
| Plaintiffs and Respondents, | |
| v. | (Los Angeles County Super. Ct. No. 22WHFL01469) |
| FELICIA BALANDRAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maria Puente-Porras, Judge. Reversed and remanded with directions.

Dennis Temko for Defendant and Appellant.

Law Office of Gerald L. Vogt, Gerald L. Vogt; Jeff Lewis Law, Jeffrey Lewis, and Kyla Dayton, for Plaintiffs and Respondents.

Felicia Balandran[1] appeals from an order granting her late husband's parents visitation with her minor children under Family Code section 3102.[2]  She contends the order violates her constitutional right as a fit parent to make decisions about her children's associations.  We agree.  Following *Troxel v. Granville* (2000) 530 U.S. 57 (*Troxel*), and subsequent California cases, we hold that the order impermissibly infringes on Felicia's fundamental parenting rights, as she was a fit parent who allowed reasonable grandparent visitation.  We therefore reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Parties and Family Background*

David and Felicia Balandran were married in 2017.  Their daughter, O.B., was born in July 2018, and a second daughter, S.B., followed in November 2019.  Prior to David's death, David's parents, Juan and Cindy Balandran (Grandparents), would see the children at family gatherings and occasionally babysit them.

In July 2021, David contracted Covid-19 and was hospitalized.  He died on August 28, 2021.  Following David's death, Felicia and her daughters temporarily moved to Felicia's family vacation home in Arizona.  While grieving, Felicia also handled practical matters, e.g., arranging Social Security benefits, managing David's 401(k) account, and reinstating the family's health insurance.

---

[1]     We refer to the parties by their first names and familial relationships to avoid confusion.  No disrespect is intended.

[2]     All further statutory references are to the Family Code unless otherwise indicated.

2

### Post-death Visitation Pattern

After David's death, Felicia continued to allow Grandparents to visit with the girls. Between September 2021 and February 2022, Grandparents saw the children multiple times each month, with visits particularly frequent in November and December 2021.

Regular visits were interrupted in March 2022 due to several events: Felicia began therapy, O.B.'s school lifted its mask mandate causing Felicia anxiety, O.B. began therapy sessions, and the family experienced several illness episodes. Visits resumed in May 2022 and continued monthly through October 2022.

### Grandparents' Petition for Visitation

On July 26, 2022, counsel for Grandparents sent Felicia a letter demanding a "permanent and long lasting solution" for visitation, requesting overnight visits and weekday dinner visits. On August 30, 2022, Grandparents filed a petition for visitation under section 3102. Their petition requested visitation on alternate weekends, weekday dinner visits, and various holiday and vacation periods.

Felicia opposed the petition, maintaining that, while she was willing to facilitate reasonable visitation, she objected to court-ordered visitation that would interfere with the girls' activities and schedules. She maintained that she was a fit parent who had "voluntarily arranged and permitted visitation between [Grandparents] and the children both before and after [Grandparents] petitioned the [c]ourt."

Visits continued while the petition was pending. The children saw Grandparents multiple times in early 2023. During

a trial setting conference on May 5, 2023, the court entered an interim visitation order over Felicia's objection, granting Grandparents two Sunday visits and one Wednesday dinner visit per month. The court also appointed counsel to represent the children.

### Court Trial and Decision

The court held a trial on Grandparents' petition in August and September 2023. Grandparents testified they had a bond with the girls and wanted to share stories and activities with them that connected to their deceased father. Cindy testified that a court order was necessary because "that's the only way it seems we would be able to see them on a consistent basis."

Felicia testified that she was not opposed to visitation but wanted flexibility to accommodate the girls' schedules, activities, and her parenting time. She explained that during the gap in visits, she was focused on her own well-being and that of her daughters, particularly given O.B.'s anxiety about Covid testing. Felicia also testified to the children's active schedules, including therapy, gymnastics, swimming, and other activities.

On November 7, 2023, the court filed its statement of decision granting Grandparents' petition. While finding that Felicia was a fit parent, the court concluded that Grandparents "can provide answers to questions about David's youth and engage in activities they engaged in with David when he was young." The court ordered that Grandparents have visitation with the children on the first and third Sundays of each month and for dinner every Wednesday.

Judgment was entered on December 4, 2023. Felicia filed a timely notice of appeal.

4

## DISCUSSION

Felicia contends on appeal that the trial court violated her "constitutionally protected rights to raise her children without undue state interference." She also argues that the trial judge exhibited bias in favor of Grandparents' position and improperly discounted her testimony. We begin by reviewing the law governing grandparent visitation in California.

## I. Governing Law

"Grandparents' rights to court-ordered visitation with their grandchildren are purely statutory." (*In re Marriage of Harris* (2004) 34 Cal.4th 210, 219.) There exists no "general or inherent rights of grandparents or authority of superior courts to mandate visitation with a grandchild over that child's parents' objection." (*White v. Jacobs* (1988) 198 Cal.App.3d 122, 124–125.)

In this case, Grandparents' petition was based on section 3102, which provides, in pertinent part: "If either parent of an unemancipated minor child is deceased, the children, siblings, parents, and grandparents of the deceased parent may be granted reasonable visitation with the child during the child's minority upon a finding that the visitation would be in the best interest of the minor child." (§ 3102, subd. (a).) The constitutional scope of statutes like section 3102 has been addressed by the United States Supreme Court, and California courts have applied these constitutional principles to section 3102.

### A. *Troxel and surviving parents' due process rights*

In the seminal case of *Troxel, supra,* 530 U.S. 57, the United States Supreme Court addressed a Washington statute that authorized courts to grant any person visitation upon a

5

finding it served the child's best interests. The court's plurality opinion recognized surviving parents' "fundamental right . . . to make decisions concerning the care, custody, and control of their children." (*Id*. at p. 66.) The Washington statute was held unconstitutional as applied because "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a 'better' decision could be made." (*Id*. at pp. 72–73.)

The *Troxel* court established three key constitutional requirements that apply when courts consider overriding a fit parent's visitation decisions: First, courts must presume fit parents act in their children's best interests. (*Troxel*, *supra*, 530 U.S. at pp. 68–69.) Second, courts must give "special weight" to the surviving parent's determination of the child's best interests rather than placing the burden on the parent to justify his or her decisions. (*Id*. at pp. 69–70.) And third, courts must consider whether the parent has offered "meaningful visitation" rather than denying contact altogether. (*Id*. at pp. 71–72.)

### B.     *California decisions following Troxel*

After *Troxel*, "[t]he cases which have considered application of section 3102 . . . have substantially circumscribed the rights otherwise provided by the statute." (*Ian J. v. Peter M.* (2013) 213 Cal.App.4th 189, 204 [citing cases], disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) California appellate courts have uniformly applied the *Troxel* court's constitutional analysis to section 3102, treating the plurality opinion as establishing binding constitutional principles. Three California appellate decisions are particularly instructive here. In each, a surviving parent successfully

6

challenged the constitutionality of section 3102 as applied to the parent's specific circumstances, where the parent objected to court-ordered grandparent visitation.

In *Kyle O. v. Donald R.* (2000) 85 Cal.App.4th 848 (*Kyle O.*), a surviving father agreed to grandparent visitation but preferred flexible scheduling over court-ordered visits. The appellate court reversed the visitation order, holding that a fit parent who allows visitation is "entitled to a presumption that he will act in his child's best interests" and that his preference for "less structured and more normal and spontaneous" visitation "must be given deference." (*Id.* at p. 863.)

Similarly, in *Punsly v. Ho* (2001) 87 Cal.App.4th 1099 (*Punsly*), disapproved on another ground by *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1225, footnote 4, the appellate court reversed a visitation order where a fit mother was willing to voluntarily schedule visitation but objected to court-ordered visits. The court held that the trial court should have "applied a presumption that [the mother's] decision regarding visitation . . . was in [the child's] best interests," rather than presuming court-ordered visitation was beneficial. (*Punsly*, at pp. 1109–1110.)

In *Zasueta v. Zasueta* (2002) 102 Cal.App.4th 1242 (*Zasueta*), the appellate court again reversed, holding that the trial court erred by finding a mother unfit based solely on her opposition to grandparent visitation. The trial court's " 'announced presumption in favor of grandparent visitation' " improperly "placed the evidentiary burden on [the mother] to show the visitation was not in the minor child's best interests," and applied its own subjective beliefs and experiences rather than giving deference to the mother's view of the minor child's best interests. (*Id.* at p. 1254.)

These cases establish that, where the parent opposing a petition under section 3102 is "a fit parent . . . who agreed to allow visitation," that parent is entitled to a presumption that he or she is acting in the best interests of his or her children, and the court must give deference to the parent's preferences as to frequency and scheduling of grandparent visitation. (*Kyle O.*, *supra*, 85 Cal.App.4th at pp. 863–864; see also *Punsly*, *supra*, 87 Cal.App.4th at p. 1109.)

Grandparents in this case rely on *Fenn v. Sherriff* (2003) 109 Cal.App.4th 1466 (*Fenn*) in an attempt to distinguish these precedents. But *Fenn* addressed only whether summary judgment in favor of a father was appropriate in a petition for visitation filed by the parents of the deceased mother. The father opposed the petition solely on the ground that he and his new wife were fit parents who objected to court-ordered visitation, and he invited the court to hold that " 'allow[ing] grandparent visitation over the objections of both parents would be an unconstitutional application of' section 3102." (*Id.* at p. 1482.) The court declined to do so. The father did not request that the court consider any voluntary allowance of visitation and, in fact, argued it was not necessary for a fit parent to provide *any* visitation to a grandparent in order to defeat such a petition. (*Ibid.*)[3]

---

[3] The *Fenn* court never reached the issue of the effect of the father's voluntary provision of some visitation with the grandparents, since the father chose to omit it from his separate statement of facts. In any event, the court noted it was far from obvious from the record that the father had offered the grandparents " 'meaningful' " visitation, where the father imposed severe restrictions on the visits, including requiring paid

While we acknowledge factual distinctions between the instant case and *Kyle O.*, *Punsly*, and *Zasueta*, the legal principles from these cases directly apply.  Where a fit parent agrees to allow visitation but objects to court-ordered scheduling, constitutional deference to the parent's preferences is required.

Having established this constitutional framework, we apply these principles to determine whether the trial court's visitation order impermissibly infringed on Felicia's fundamental parenting rights.

## II.    Standard of Review

Felicia contends that section 3102 is unconstitutional as applied to her.  An as-applied challenge does not argue that a statute is unconstitutional in all circumstances, but rather that its application in the specific context of a particular case violates constitutional rights.  (See *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.)  The constitutional right at issue here—the fundamental right of parents to raise their children—includes " 'the right to determine with whom their children should associate.' " (*Punsly*, *supra*, 87 Cal.App.4th at p. 1107.)

"A constitutional due process challenge based on an alleged infringement of this fundamental right requires the court to apply a strict scrutiny test.  The statute at issue must serve a compelling state interest, and it must be narrowly tailored to serve that interest. . . . [A]n order for nonparental visitation issued over the objection of a competent custodial parent does not withstand such a test when the court ignores a parent's voluntary

---

supervision and prohibiting mention of the deceased mother. (*Fenn*, *supra*, 109 Cal.App.4th at p. 1484.)

efforts to arrange visitation and effectively places a burden on a parent to disprove a presumption that nonparental visitation is in his or her child's best interests." (*Punsly, supra,* 87 Cal.App.4th at p. 1107.)

"When reviewing an as-applied constitutional challenge on appeal, we defer to the trial court's findings on historical facts that are supported by substantial evidence, and then independently review the constitutionality of the statute under those facts." (*People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1378.) "To overcome the presumption that a fit parent will act in the best interest of the grandchild, a grandparent has the burden of proof and must show, by clear and convincing evidence, that denial of visitation is not in the best interest of the grandchild, i.e., denial of visitation would be detrimental to the grandchild." (*Rich v. Thatcher* (2011) 200 Cal.App.4th 1176, 1180.)

## III.  The Trial Court Erred in Ordering Grandparent Visitation

Felicia argues that the trial court erred in granting Grandparents' petition over her objection as a fit parent who allowed grandparent visitation. We agree.[4]

---

[4]     It is undisputed from the record that the trial court's order granting Grandparents' petition substantially affects Felicia's ability to make parenting decisions for her daughters. The evidence at trial showed that the interim visitation order entered in May 2023 empowered Grandparents to override Felicia's preferences in favor of their own. For example, Felicia enrolled her children in gymnastics on the advice of their pediatrician, but Grandparents advised they would take the girls to gymnastics when it did not interfere with their plans, and Grandparents

### A.	Felicia's parenting decisions are presumed to be in the children's best interests

Felicia is entitled to the presumption that her decisions regarding grandparent visitation are in her children's best interests, since she is a fit parent who allowed Grandparents to visit her daughters.  Grandparents conceded, and the trial court expressly found, that Felicia is a fit parent.  Moreover, it is undisputed that Grandparents had regular visits with O.B. and S.B. up until May 2023, when the court entered its interim visitation order.  In fact, it appears Grandparents saw O.B. and S.B. significantly more often than the grandparents in *Troxel*, *Punsly*, *Kyle O.,* and *Zasueta* did their grandchildren.  In *Troxel*, the surviving parent allowed her in-laws "one short visit per month and special holidays." (*Troxel*, *supra*, 530 U.S. at p. 71.)  The court found this amounted to "meaningful visitation to the [grandparents]." (*Id.* at p. 72.)  In *Punsly*, the surviving parent allowed the grandparents to visit once every three months on Sundays, and to call their granddaughter on the telephone. (*Punsly*, *supra*, 87 Cal.App.4th at p. 1108.)  In *Kyle O.*, the surviving parent "acknowledged that, during the last three years, he had not arranged for [his daughter] to see the grandparents outside of court-ordered visits," but he "agreed to allow visitation with them; he only contested their right to specify the amount and timing of the visitation." (*Kyle O.*, *supra*, 85 Cal.App.4th at pp. 859, 863.)  Finally, the surviving mother in *Zasueta* was opposed to visitation, but "indicated she would be willing to allow some visitation, '[m]aybe limited to a couple hours a month,' if

openly disregarded Felicia's preference that the girls not attend amusement parks.

11

the [grandparents] would be helpful in resolving" an outstanding dispute over the deceased father's personal effects. (*Zasueta, supra*, 102 Cal.App.4th at p. 1246.)

Grandparents' evidence in this case establishes they had regular visits with O.B. and S.B., albeit less frequently than they would have liked. In fact, Grandparents understate their contacts with the girls because they do not include "school events, soccer events or extra-curricular activities where [they] were able to observe the girls" as "visits." Grandparents' preferences aside, the record confirms that, in the absence of a court order, Felicia afforded Grandparents "meaningful" or "reasonable" visitation.[5]

Because Felicia is a fit parent who afforded Grandparents meaningful or reasonable visitation, we presume that her preferences regarding visits with Grandparents are in the best interests of her children. Accordingly, we examine (1) whether Grandparents proved, by clear and convincing evidence, that the visitation allowed by Felicia was detrimental to the children, and (2) whether the trial court gave "special weight" to Felicia's preferences. For the reasons discussed below, we answer both questions in the negative. The trial court's findings regarding "detriment" lack evidentiary support, the court failed to give Felicia's preferences the "special weight" required by *Troxel*, and

---

[5] We also note, for all of their concern about being treated the same as Felicia's parents, nothing in the record indicates Grandparents saw the children less often than Felicia's parents did. Felicia's father testified, "It's never like every Tuesday or Thursday, ever[y] dinner night, anything like that. No, we don't do any of that. It's just kind of a random, hit-and-miss type of deal. And sometimes I might see them a little more, a little less."

the court's speculation that Felicia would deny all visitation absent a court order is unsupported by the record.

### B.    Grandparents failed to produce clear and convincing evidence that Felicia's voluntary visitation schedule was detrimental to the children

The trial court's finding of "detriment" to O.B. and S.B. was based on its conclusion that only Grandparents "can provide answers to questions about David's youth and engage in activities they engaged in with David when he was young," and that by "Papa Juan and Nana Cindy sharing the activities and stories of David, . . . that will certainly bring the children closer to knowing who their father was as he was growing up, and those stories are not any that the Maternal grandparents can provide[ ] or Mother for that matter." The trial court's concern about potential future harm to the children was not supported by clear and convincing evidence to overcome the constitutional presumption favoring a fit parent's decisions.

The trial court's findings are substantively indistinguishable from the "slender findings" in *Troxel* that failed to support the visitation order. (*Troxel*, *supra*, 530 U.S. at p. 72.) Like in *Troxel*, the finding of "detriment" adopted by the trial court affords no basis to override the presumption favoring Felicia's decisions regarding her daughters' association with their paternal grandparents.

It will almost always be the case that the parents of a decedent will be knowledgeable about their son or daughter's early years. If a trial court may order visitation based on the grandparents' superior knowledge about the decedent's youth, the presumption favoring the fit parent's decisions regarding

13

visitation would be meaningless. This is especially true where, as here, Felicia was already allowing Grandparents reasonable visitation with O.B. and S.B.

The trial court's decision also reveals that the court presumed Grandparents alone could provide love and support to O.B. and S.B. at important times. Thus, the court criticized Felicia for having her brother take the children home from their father's funeral, calling this "a lost opportunity for the minors to be comforted, be provided love and support . . . ." Likewise, the court found that Grandparents' absence from the trip to take the father's remains to the Colorado River was detrimental to the children because Grandparents "would have afforded the girls extra support at such a momentous event."

The children did not testify, and neither side introduced any expert testimony or opinion about them. Our review of the record discloses no evidence from which the trial court could infer that either O.B. or S.B. suffered detriment by being cared for and comforted by people other than Grandparents.

Grandparents emphasize the trial court's findings that Felicia was not credible on certain points, including her testimony about blaming Grandparents for David's death and the number and nature of visits that occurred. Even accepting these credibility determinations, we find they relate primarily to peripheral matters and past interactions, rather than Felicia's current willingness to facilitate visitation. Such findings do not diminish the constitutional deference due to Felicia as a fit parent or provide the clear and convincing evidence required to overcome the presumption that her decisions about the frequency and structure of grandparent visitation are in her children's best interests.

The trial court's assumptions about the importance of a grandparent's love are no substitute for clear and convincing evidence that Felicia's decisions were detrimental to the children. And Grandparents' desire to "engage in activities they engaged in with David when he was young" does not take precedence over Felicia's wishes. As the court explained in *Kyle O.*, "as a matter of law, [the mother's] death did not imbue the grandparents with their daughter's parental rights or diminish [the surviving father's] parental rights. Nothing in the unfortunate circumstance of one biological parent's death affects the surviving parent's fundamental right to make parenting decisions concerning their child's contact with grandparents." (*Kyle O.*, *supra*, 85 Cal.App.4th at p. 863.)

## C. The trial court gave no "special weight" to Felicia's preferences

As a fit parent who has agreed to meaningful visitation, Felicia has a fundamental right to prefer flexible unscheduled visitation that does not interfere with her quality parenting time with her daughters, or with their other activities. (See *Kyle O.*, *supra*, 85 Cal.App.4th at pp. 863–864.) Evidence that the trial court failed to afford "special weight" to Felicia's parenting decisions regarding the type and frequency of visits with Grandparents appears on the face of the record, commencing with the trial court's statement criticizing Felicia for scheduling Grandparents' visits during "leftover time."

While the trial court was clearly well-intentioned and expressed genuine concern for the children's welfare, the record reflects that it did not apply the constitutional deference required under *Troxel*. Rather than applying the required presumption that Felicia's decisions were in the children's best interests, the

15

trial court substituted its own judgment about the appropriate number and scheduling of grandparent visits.

Commenting on Felicia's reluctance to alter the children's schedules to accommodate more frequent visits with Grandparents, the court did not question "[her] freedom to make those decisions," but nonetheless criticized Felicia for preferring the activities she selected and scheduled for the girls: "[Felicia's] contentions . . . that appointments for the girls are or would be difficult to change and be challenging, the [c]ourt finds not credible as is evidenced by her own meticulous schedules reflecting change of therapy appointments to accommodate travel or other personal activities." The court similarly questioned Felicia's decisions to take the girls to the Colorado River rather than to see Grandparents, stating that "while [she] would have this court believe that she is concerned about possible contamination, she herself, based on her calendars submitted into evidence, reflect that she was taking the children to activities, traveling with them across state lines to Arizona. While she has every right to do so, her contentions and justification for limiting the contact with [Grandparents] is disingenuous."

Like the Washington court in *Troxel*, the trial court erred by substituting its own judgment for that of a fit parent. Namely, it made a "presumption in favor of grandparent visitation," rather than affording "special weight" to Felicia's parenting decisions. While the court's concern about maintaining family relationships is understandable, *Troxel* requires that such concerns yield to the constitutional presumption favoring a fit parent's decisions.

16

The trial court applied an impermissible "best interests" analysis rather than the "detriment" standard required by *Troxel*, i.e., whether additional grandparent visitation would be better for the children, rather than whether Felicia's voluntary visitation schedule would cause them detriment. This constitutional error reversed the appropriate legal burden: Instead of requiring Grandparents to prove by clear and convincing evidence that Felicia's decisions would harm the children, the court required Felicia to justify why her parenting preferences were superior.

### D. No evidence supports the trial court's finding Felicia would deny visitation absent a court order

We next address the trial court's conclusion that Felicia left it no choice but to order grandparent visitation because she would likely deny future visitation absent a court order. The court concluded: "The evidence has shown that [Felicia] has already absented the minors from visitation for 80 days, there is no telling what the gap would be if the court were to decline to make a visitation order, causing continued detriment to the children." To the contrary, the record makes clear that Felicia had allowed Grandparents reasonable visitation in the absence of a court order. Specifically, Grandparents admitted they saw the children, on average, more than four hours each month between February 2022 and April 2023—a period that includes the 80-day gap in visits cited by the trial court. Our review of the record discloses no evidence to support a finding that Felicia's expressed preference for a relationship unencumbered by a court order indicated she would deny Grandparents reasonable visitation in the future.

17

We observe that the 80-day gap in visits that concerned the trial court occurred during a unique period shortly after David's death when Felicia was managing her own grief, addressing her children's needs, and navigating Covid-19 concerns. Such a temporary interruption in visitation—occurring within the first year of bereavement and followed by a resumption of regular visits that continued for more than a year before trial—does not overcome the constitutional presumption that a fit parent's decisions about third-party visitation are in her children's best interests. As recognized in *Punsly*, even longer periods without grandparent contact (approximately five months in that case) did not justify overriding a fit parent's constitutional rights when she was willing to allow reasonable visitation. (See *Punsly*, *supra*, 87 Cal.App.4th at p. 1108.)

Beyond this isolated gap in visitation, the record provides no support for the concern that Felicia would deny visits in the future. Nothing in Felicia's testimony indicated any intention to withhold the children from Grandparents. Instead, Felicia testified that she was "willing to continue working out visitation with [Grandparents] if there [was] not a court order," and that she wanted the girls "to maintain healthy relationships with all family members." Nor did either grandparent's testimony support a finding that a court order was necessary. When asked by her counsel why she believed a court order was necessary, the only reason Cindy could articulate was that Felicia opposed a court order. Juan, in turn, testified that he did not believe Felicia would allow 18 hours of visitation each month in the absence of a court order, which provides no evidence that Felicia would withhold visits entirely. In their response to Felicia's opposition to the petition, Grandparents asserted that, in the

18

absence of a court order, they "would see the girls, maybe once a month for two hours and restricted to [their] home," but not that Felicia would withhold visitation entirely.

Nothing in *Kyle O.*, *Punsly*, or *Zasueta* supports an inference that the 80-day gap in visits in March and April of 2022 demonstrates that Felicia would deny visitation altogether. To the contrary, these cases demonstrate that long gaps between visits are by no means unusual. (See, e.g., *Kyle O.*, *supra*, 85 Cal.App.4th at p. 859 [surviving father would not agree to visits, other than court-ordered visits, for three years]; *Zasueta*, *supra*, 102 Cal.App.4th at p. 1244 [surviving mother precluded visits for four months after father's death]; see also *Punsly*, *supra*, 87 Cal.App.4th at p. 1108 [rejecting grandparents' argument that, because they were not allowed visitation for five months, visitation would not occur without court intervention].)

We recognize that a trial court is permitted to draw reasonable inferences from the evidence. An inference, however, " ' "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture or guess work." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.) The trial court's concerns here about future visitation lacked the evidentiary foundation required by constitutional standards. The record contains no substantial evidence from which the trial court could reasonably infer that, in the absence of a court order, Felicia would deny Grandparents reasonable visitation to the detriment of the children.

### E.     *Felicia's claim of judicial bias*

Felicia also argued that the trial court showed personal bias toward grandparent visitation and prejudged the case before hearing the evidence. In light of our conclusion that the

19

visitation order is unconstitutional, we do not address this additional claim.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to vacate its order granting Grandparents' petition for visitation and to enter a new order denying the petition. Felicia Balandran is awarded her costs on appeal.


GAAB, J.*


We concur:


EDMON, P. J.



EGERTON, J.

---

\*      Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 8/21/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CYNTHIA BALANDRAN et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> FELICIA BALANDRAN, <br><br> Defendant and Appellant. | B335531 <br><br> (Los Angeles County Super. Ct. No. 22WHFL01469) <br><br> **Order Certifying Opinion for Publication** <br><br> [No change in judgment] |

THE COURT:

The opinion in the above-entitled matter filed on July 22, 2025, was not certified for publication in the Official Reports.  Upon request by a nonparty to this action and for good cause, it now appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c).  The opinion is ordered published in the Official Reports.

EDMON, P. J.                 EGERTON, J.                 GAAB, J.*

_____

\*      Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.